**ROBINS KAPLAN LLP**
Roman M. Silberfeld (SBN 62783)
RSilberfeld@RobinsKaplan.com
Breton A. Bocchieri (SBN 119459)
BBocchieri@RobinsKaplan.com
Michael A. Geibelson (SBN 179970)
MGeibelson@RobinsKaplan.com
Daniel L. Allender (SBN 264651)
DAllender@RobinsKaplan.com
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: (310) 552–0130
Facsimile: (310) 229–5800

**AXINN VELTROP & HARKRIDER LLP**
Michael L. Keeley (*admitted pro hac vice*)
mkeeley@axinn.com
Rachel Johanna Adcox (*admitted pro hac vice*)
radcox@axinn.com
Jarod G. Taylor (*admitted pro hac vice*)
jtaylor@axinn.com
90 State House Square
Hartford, CT 06103
Telephone: (860) 275–8109
Facsimile: (860) 275–8101

*Attorneys for Defendant*
Redbox Automated Retail LLC

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DISNEY ENTERPRISES, INC., *et al.*, | Case No. 2:17-cv-08655-DDP (AGRx) |
| Plaintiffs, | Hon. Dean D. Pregerson |
| vs. | **DEFENDANT REDBOX'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| REDBOX AUTOMATED RETAIL, LLC, | Hearing Date: February 5, 2018 |
| Defendant. | Hearing Time: 10:00 a.m. |
| | Complaint filed: November 30, 2017 |
| | Trial Date: Not Set |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENT OF FACTS ................................................................... 3

    A.     Redbox rents and sells movies to a unique and loyal customer base. ................................................................................................... 3

    B.     Redbox's business model benefits Plaintiffs and retailers. .................. 3

    C.     Consumers have no complaints about Redbox's digital code sales. ................................................................................................... 4

    D.     Redbox will be harmed by a Preliminary Injunction. ........................... 5

    E.     Disney's copyright misuse has already interfered with Redbox. .......... 5

III.   STANDARD OF REVIEW ................................................................. 5

IV.    PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................ 6

    A.     Plaintiffs' Copyright Claims Are Barred by the First Sale Doctrine ............................................................................................... 6

    B.     No Enforceable Contract Limits Transfer of the Codes ..................... 10

    C.     There is No Contributory Infringement ............................................. 13

    D.     Plaintiffs Are Engaged In Copyright Misuse ..................................... 14

    E.     Plaintiffs Will Not Succeed On Their State Law Claims ................... 17

        1.     Redbox's advertising and sale of digital copies are immunized by the UCL's and FAL's "Safe Harbor" and the Copyright Act's preemption provision. ............................... 17

        2.     Plaintiffs lack standing to assert UCL or FAL violations ........ 19

        3.     Plaintiffs will fail on their 17500 claim .................................. 20

        4.     The FAL and UCL do not apply extraterritorially and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

88666830.4

i

REDBOX'S OPPOSITION TO
PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

cannot support an injunction addressing conduct outside
California. .................................................................................20

5.    Plaintiffs have not established tortious interference.................21

6.    Plaintiffs will fail on their 17200 claim.....................................22

V.    THE BALANCE OF HARMS SHARPLY FAVORS REDBOX .................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ...................................................................... 13, 14

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ............................................................................ 24

*Adobe Sys. v. Christenson*,
   809 F.3d 1071 (9th Cir. 2015) ................................................................................ 6

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
   166 F.3d 772 (5th Cir. 1999) ................................................................................ 15

*Amylin Pharm., Inc. v. Eli Lilly & Co.*,
   456 F. App'x 676 (9th Cir. 2011) ......................................................................... 24

*Bobbs-Merrill Co. v. Straus*,
   210 U.S. 339 (1908) ....................................................................... 6, 16, 17, 25

*Burke & Van Heusen, Inc. v. Arrow Drug, Inc.*,
   233 F. Supp. 881 (E.D. Pa. 1964) .......................................................................... 9

*Capitol Records, LLC v. ReDigi Inc.*,
   934 F. Supp. 2d 640 (S.D.N.Y. 2013) ............................................................. 13, 14

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone
   Co.*,
   20 Cal.4th 163 (1999) ........................................................................................ 17

*Cortez v. Purolator Air Filtration Products Co.*,
   23 Cal.4th 163 (2000) ........................................................................................ 22

*CRST Van Expedited, Inc. v. Werner Enters.*,
   479 F.3d 1099 (9th Cir. 2007) ............................................................................ 22

*Diamond Multimedia Systems, Inc. v. Super. Ct.*,
   19 Cal.4th 1036, 80 Cal.Rptr.2d 828 (1999) ................................................... 20

iii

*DSC Communications Corp. v. DGI Techs., Inc.*,
   81 F.3d 597 (5th Cir. 1996) ................................................................. 14

*Ebner v. Fresh Inc.*,
   2013 U.S. Dist. LEXIS 188889 (C.D. Cal. Sep. 11, 2013) ...................... 18

*Fagerstrom v. Amazon.com, Inc.*,
   141 F. Supp. 3d 1051 (S.D. Cal. 2015) .................................................. 11

*Farmers Ins. Exchange* v. *Superior Court*,
   2 Cal.4th 377 (1992) ............................................................................ 22

*Fisher v. San Pedro Peninsula Hospital*,
   214 Cal. App. 3d 590 (1989) ............................................................... 21

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
   654 F.3d 989 (9th Cir. 2011) ........................................................... 5, 23

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) ................................................................. 14

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) .................................................................. 5

*Gold Club-SF, LLC v. Platinum SJ Enter.*,
   No. 13-cv-03797-WHO, 2013 U.S. Dist. LEXIS 134379
   (N.D. Cal. Sep. 18, 2013) .................................................................... 23

*Isaiah Khoury v. Maly's of California, Inc.*,
   14 Cal. App. 4th 612 (1993) ............................................................... 23

*Kenneth Klein v. Earth Elements, Inc.*,
   59 Cal. App. 4th 965 (1997) ............................................................... 23

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ................................................................ 19, 22

*Krantz v. BT Visual Images*,
   89 Cal.App.4th 164 (2001) .................................................................. 22

*Lasercomb Am., Inc. v. Reynolds*,
   911 F.2d 970 (4th Cir. 1990) ..................................................... 14, 15, 16

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

iv

*Lazar v. Hertz Corp.*,
    69 Cal. App. 4th 1494 (1999)................................................................17

*McGuire v. Times Mirror Co.*,
    405 F. Supp. 57 (C.D. Cal. 1975)........................................................25

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010)...........................................................12, 13

*Motown Record Corp. v. George A. Hormel & Co.*,
    657 F. Supp. 1236 (C.D. Cal. 1987)....................................................18

*Norcia v. Samsung Telcoms. Am., LLC*,
    845 F.3d 1279 (9th Cir. 2017).................................................10, 11, 12

*Norwest Mortgage, Inc. v. Super. Ct.*,
    72 Cal.App.4th 214, 85 Cal.Rptr.2d 18 (1999)...................................20

*Omega S.A. v. Costco Wholesale Corp.*,
    776 F.3d 692 (9th Cir. 2015).................................................14, 15, 25

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990).......................................................................21

*Practice Mgmt. Info. Corp. v. AMA*,
    121 F.3d 516 (9th Cir. 1997).................................................14, 15, 16

*Premier Nutrition, Inc. v. Organic Food Bar, Inc.*,
    475 F. Supp. 2d 995 (CD. Cal. 2007)..................................................23

*Quelimane Co. v. Stewart Title Guaranty Co.*,
    19 Cal. 4th 26 (1998).............................................................21, 22, 23

*Renick v. Dun & Bradstreet Receivable Management Services*,
    290 F.3d 1055 (9th Cir. 2002)............................................................22

*Sega Enters. Ltd. v. MAPHIA*,
    948 F. Supp. 923 (N.D. Cal. 1996)......................................................14

*Softman Products Co. LLC v. Adobe Systems Inc. et al.*
    171 F. Supp. 1075 (C. D. Cal. 2001)....................................................8

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191, 127 Cal. Rptr. 3d 185, 254 P.3d 237 (2011)..........20

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

v

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) .................................................................. 18

*UMG v. Augusto*,
   628 F. 3d 1175 (9th Cir. 2011) ............................................ 6, 7, 8, 9, 10

*Van Ness v. Blue Cross*,
   87 Cal.App.4th 364 (2001) ..................................................................... 22

*Vernor v. Autodesk, Inc.*
   621 F. 2d 1102 (9th Cir. 2010) ................................................................ 7

*Walker v. USAA Cas. Ins. Co.*,
   474 F. Supp. 2d 1168 (E.D. Cal. 2007) ................................................. 19

*White v. Western Title Ins. Co.*
   40 Cal.3d 870 (1985) ............................................................................. 12

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ............................................................................. 5, 23

*Xerox Corp. v. Apple Comput., Inc.*,
   734 F. Supp. 1542 (N.D. Cal. 1990) ..................................................... 18

*Youst v. Longo*,
   43 Cal. 3d 64 (1987) .............................................................................. 21

**Statutes**

17 U.S.C. § 106 ............................................................................................ 18

17 U.S.C. § 106(1) ....................................................................................... 17

17 U.S.C. § 106(3) ....................................................................................... 17

17 U.S.C. § 109 ............................................................................................ 13

17 U.S.C. § 109(a) ......................................................................... 6, 9, 10, 13

17 U.S.C. § 301 ............................................................................................ 18

17 U.S.C. § 301(a) ....................................................................................... 18

Cal. Bus. & Prof. Code § 17204 ........................................................... 18, 19

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Cal. Bus. & Prof. Code § 17500 ................................................................ 19, 20, 22

Cal. Bus. & Prof. Code § 17535 ................................................................ 18, 19

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## I.  INTRODUCTION

Just as it has done for years with DVD rentals, Redbox recently started selling codes for digital movies from its automated kiosks. Redbox's customers like that. Disney and its subsidiaries don't. By this motion, Plaintiffs seek to stifle competition to more smoothly launch Disney's own digital content streaming service, maximize the price other services like iTunes and Amazon (and their customers) pay for Disney movies, and secure a greater market share for Hulu—the viewing service Disney will control as part of its $52 billion acquisition of 21st Century Fox. These anti-consumer and anti-competitive ends do not support a preliminary injunction, and neither do the Plaintiffs' evidence or applicable law.

Plaintiffs ask this court to wholly rewrite seven cryptic and ambiguous words—"codes are not for sale or transfer"—into an after-the-fact, restrictive license in violation of basic principles of contract law, the first sale doctrine and Ninth Circuit precedent. But even in their nearly illegible form, and although Plaintiffs imply the packaging for all of them is the same, these words appear on only 5 of the Combo Packs listed in the Complaint's Exhibit A. Other language appears elsewhere, and in varied forms, but none of it voids the first sale of the digital movies, and none forms a binding contract.

Many facts here are undisputed. Plaintiffs sold codes for digital movies as part of Combo Packs to authorized retailers. These codes allow purchasers to redeem digital movies online. And Redbox has the right to transfer the code if it is transferred along with a rest of the Combo Pack. Plaintiffs' sole complaint is that Redbox should be preliminarily enjoined from separately selling the codes Redbox lawfully purchases, and thus the digital movie corresponding to it, at a lower cost than what Plaintiffs would like.

Under clear lines of authority concerning this type of copyrighted work (film and performing arts), no restrictive license is created by the sale, and Plaintiffs' after-the-fact attempt to restrain trade is unsupported in law and fact. The

REDBOX'S OPPOSITION TO
PRELIMINARY INJUNCTION

presentation of terms on websites that deliver the digital movies Plaintiffs sold creates no license or other contract with Redbox or any of its customers, nor does it create a limitation on customers obtaining the movies Plaintiffs previously sold.

Without after-the-fact licenses being formed or a defense against the first sale doctrine, all of Plaintiffs' claims fail. So Plaintiffs ask this court to find that accessing the digital movies they sold is somehow an act of infringement. This argument ignores the fact that the digital movies were sold in the first instance, not licensed, and that no copy is created other than that which Plaintiffs obligated themselves to deliver by selling a code, and that the first sale doctrine squarely applies and prevents any claim of contributory infringement against Redbox. Plaintiffs' authorities on this point address the very different situation where a copy is made that was not purchased. Here, reproduction is not an issue. By selling the digital code, Plaintiffs committed to distributing (digitally delivering) the digital copy consumers download as part of the first sale.

With no law or facts to support their case, Plaintiffs' motives become clear. Years ago, the movie studios attempted to quash competition by suing movie rental companies to prevent them from renting and reselling videocassettes. The courts rejected those efforts and held movie rental companies had the right to rent and sell the movies they purchased under the first sale doctrine. Since then, technology has evolved to permit movies to be downloaded using digital codes. But basic copyright and contract principles have remained the same. Redbox and other resellers still have the right to resell the copies of movies they buy from retailers. Plaintiffs tacitly admit they seek to thwart competition and require consumers to pay higher prices for digital codes than what they could buy them for from Redbox. Copyright law, contract law, and the public interest all compel the conclusion that preliminary injunctive relief should be denied.

## II.   STATEMENT OF FACTS

### A.   Redbox rents and sells movies to a unique and loyal customer base.

Since launching in 2002, Redbox has offered newly released movies at the best prices by renting and selling them out of over 41,000 automated kiosks. Smith Decl. ¶ 3–5; Chamberlain Decl. ¶ 2. These kiosks serve a market segment that is not served, or not served well, by other retailers and streaming services. Smith Decl. ¶ 6. Redbox passes on the savings, and its customers are loyal and rent movies frequently. *Id.* at ¶ 7. In addition to digital copies of Disney movies, Redbox also recently began offering movies on demand from the other major studios. *Id.* at ¶ 4.

### B.   Redbox's business model benefits Plaintiffs and retailers.

Without a Disney vendor agreement (like the ones it has with the other major studios), Redbox's 1,000-member field staff must purchase Disney, Marvel, and Lucasfilm titles through normal retail channels in the same way other consumers do—at grocery stores, convenience stores, department stores and electronics stores. Chamberlain Decl. ¶¶ 2–5. Field staff members are not asked to, and do not, accept terms and conditions of any kind as a part of their transactions. *Id.* at ¶ 5. Redbox pays retail prices for Disney Combo Packs and helps retailers sell the Disney inventory they purchase. Smith Decl. ¶ 8. Doing so helps retailers and Plaintiffs fulfill their revenue goals, while Redbox's sale of digital codes defrays the higher cost of Combo Packs. *Id.* at ¶ 9.

Redbox's sale of digital copies serves Disney's goal of introducing viewers to digital movies and migrating them away from physical discs. *Id.* at ¶ 10. Moreover, when Redbox customers use Disney movie websites, the sites acquire valuable Redbox customer information that they could not otherwise get. *Id.* at ¶ 10. That information can be used to market Disney products and services, save substantial customer acquisition costs, and develop direct-to-customer relationships that cut out revenue shares currently paid to licensees (e.g. Amazon, iTunes, and

3

Vudu). *Id.* at ¶¶ 10–11. The lower price of content also discourages piracy, and reduces the likelihood (and number) of sales of the same content through bazaar-type websites like eBay and Craig's List. *Id.* at ¶¶ 12–13.

Plaintiffs' speculation that they will lose sales from Redbox selling digital codes is unsubstantiated. *Id.* at ¶ 14. Just as when DVDs began being rented years ago, the increased availability of movies through digital downloads will make movies more accessible to a broader audience who the studios do not effectively reach, and who are more cost-conscious and potentially less tech-savvy than those who already use subscription-based and view-based digital services. *Id.*

The exaggeration of Plaintiffs' harm hypothesis is shown by the one film released since Redbox began selling codes that Plaintiffs' declarant characterized as a miss—*Cars 3*. Marinelli Dep. (App'x of Sealed Documents, Ex. D) 77:23–78:12; Smith Decl. ¶ 15. The majority of Redbox's sales occurred at the same price—$14.99—Disney licensees charged, and Redbox only managed to sell about 350 total codes. *Id.* And licensees commenced sales of downloads more than two weeks before consumers became aware Redbox sold digital codes for that movie. *Id.* If anything, viewers have been trained to wait a short while for a new release to appear on Netflix; for example, *Cars 3* becomes accessible on January 31, 2018. *Id.* at ¶ 16. So Redbox's sale of *Cars 3* digital codes could not have caused any harm.

**C.     Consumers have no complaints about Redbox's digital code sales.**

When merchandising digital codes, Redbox takes great care to ensure all the materials that originally accompany the original inserts containing digital codes are included in its jewel cases. Chamberlain Decl. ¶¶ 7–8. Contrary to Plaintiffs' concerns, digital codes usually have expiration dates years after their initial release; Redbox does not sell digital movies that are near or past their codes' stated expiration date. *Id.* at ¶ 9. Thus, Redbox has not had complaints about the content, process, terms, purchasing, or accessing of digital movies using digital movie download codes. *Id.* at ¶ 10.

**D.    Redbox will be harmed by a Preliminary Injunction.**

Redbox has spent the better part of a year, over $700,000, and substantial resources preparing computer systems, product databases, kiosks, and staff to merchandise and sell digital movie downloads. Smith Decl. ¶ 17; Chamberlain Decl. ¶ 11. Redbox would suffer significant financial harm and a loss of goodwill if its efforts were wasted because it was required to abruptly stop doing so. Smith Decl. ¶ 18; Chamberlain Decl. ¶ 12. An injunction that removes Redbox from the digital download market when the technology is emerging is also likely to cause permanent and unquantifiable harm to its ability to participate in that market—a harm that is amplified by Disney's impending launch of its own streaming service. Smith Decl. ¶ 21.

**E.    Disney's copyright misuse has already interfered with Redbox.**

Redbox previously attempted to negotiate a vendor agreement with Disney. *Id.* at ¶ 19. However, it demanded terms that would delay Redbox's distribution of Disney new releases for so long as to seriously impede Redbox's ability to rent and sell those titles when people want them most. *Id*. As a result, Redbox turned to buying DVDs from retailers. *Id*. Disney responded by prohibiting at least one retailer from selling to Redbox. *Id.* at ¶ 20.

**III.    STANDARD OF REVIEW**

Plaintiffs bear the burden of showing that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Likelihood of success on the merits is "the most important" factor. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). However, Plaintiffs may not rely on a "presumption of harm" but rather must submit "actual evidence." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**IV.   PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS**

   **A.   Plaintiffs' Copyright Claims Are Barred by the First Sale Doctrine**

   This case is governed by the first sale doctrine. The first sale doctrine provides that "the owner of a particular copy or phonorecord lawfully made under [the Act …] is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a). The seminal illustration of the doctrine is found in *Bobbs-Merrill Co. v. Straus,* 210 U.S. 339, 341 (1908), where a copyright owner unsuccessfully attempted to restrain the resale of a copyrighted book by including in it the following notice: "The price of this book at retail is $1 net. No dealer is licensed to sell it at a less price, and a sale at less price will be treated as an infringement of the copyright." *Id.* The Court noted that the statutory grant to a copyright owner of the "sole right of vending" the work did not continue after the first sale of a given copy. *Id.* 349–50. "The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it." *Id.* at 350. "The rule of *Bobbs-Merrill* remains in full force, enshrined as it is in § 109(a) of the Act: a copyright owner who transfers title in a particular copy to a purchaser cannot prevent resale of that particular copy." *UMG v. Augusto*, 628 F. 3d 1175, 1180 (9th Cir. 2011).

   When a copyrighted work is sold, there is a presumption that the transaction transferred title to a copy of the work that is subject to the first sale doctrine. *See Adobe Sys. v. Christenson*, 809 F.3d 1071, 1080 (9th Cir. 2015). Where, as here, a copyright holder claims that an alleged infringer possesses only a license and not a copy of its work, the plaintiff bears the burden of showing that only a license was created. *Id.* Plaintiffs cannot meet this burden.

   Here, Plaintiffs admit that they sold Combo Packs to retailers. Yet, there's no evidence before the Court of agreements imposing licenses or other terms on those

sales. Marinelli Dep. 113:17–115:18. And the "Combo Packs" contain three versions of the same film: a Blu-Ray disc, a DVD disc, and a code for a digital copy. The code authenticates the delivery of a single digital copy of the movie. *Id.* at 155:1–3. Plaintiffs concede that Redbox may rent or resell the Blu-Rays and DVDs pursuant to the first sale doctrine, but absurdly assert that the code cannot be transferred unless it is transferred with the DVD and Blu-Ray disc. They erroneously contend that the digital copy should be treated differently because the phrase "Codes are not for sale or transfer" appears on *some* of the asserted packages. However, this phrase, which is often printed so small that it is barely readable, actually only appears on five of the twenty titles cited in the Complaint. The other fifteen have no such restriction.[1] Plaintiffs' chief declarant also admitted that the same Disney titles are sold inside different packaging versions that contain different information on the outside, leaving in doubt which versions were purchased by Redbox versus the versions submitted by Plaintiffs. Marinelli Dep. at 222:21–227:14.

Even as to those packages that contain the phrase, the phrase still fails to transform the transaction from the sale of a digital copy into the sale of a license. As the Ninth Circuit noted in *UMG*, there are "three considerations that we may use to determine whether a software user is a licensee, rather than an owner of a copy. First, we consider whether the copyright owner specifies that a user is granted a license. Second, we consider whether the copyright owner significantly restricts the user's ability to transfer the software. Finally, we consider whether the copyright owner imposes notable use restrictions." 628 F.3d at 1183.

---

[1] After Redbox's counsel pointed out that Plaintiffs' motion was misleading, counsel for Plaintiffs submitted a supplemental declaration that shows the phrase appears on only five of the packages. *See* Dkt. 28. The declaration argues that similar language is found on some of the cards inserted inside the packages, which consumers obviously cannot see until after making the sale. However, the majority of the packaging contains no restriction whatsoever. *See id.*

7

REDBOX'S OPPOSITION TO
PRELIMINARY INJUNCTION

1    Here, the facts surrounding the sale of Disney's movies do not satisfy the

2  above test. First, Plaintiffs did not specify that a user is granted a license.

3  (Plaintiffs' motion does not even argue that it is selling a license.) Second,

4  Plaintiffs do not significantly restrict the user's ability to transfer the digital movie.

5  For example, the digital movie code is freely sold by retailers, and Plaintiffs have

6  produced no evidence that a separate license agreement was entered with those

7  retailers to transfer the movie. Moreover, Plaintiffs' declarant admits that

8  consumers may purchase and transfer the entire combo pack—including the digital

9  copy—as a gift. Third, the copyright owners impose no use restrictions other than

10  the standard geographic limitation that is asserted on all media sold in the United

11  States. Moreover, the phrase, "Codes are not for sale or transfer," plainly does not

12  mean that a user cannot *use* the code to obtain the movie it purchased. As such, no

13  restrictive license is present and Plaintiffs' rights to control distribution are

14  exhausted by the first sale doctrine.

15    Nor is the limitation appearing on some of the packaging sufficient to put the

16  purchaser on notice that a contract is being offered or a license is being created. For

17  example, in *UMG*, the Ninth Circuit found that the words "Promotional Use Only—

18  Not for Sale" did "not even purport to create a license."[2] *Id.* at 1182; *Softman*

19  *Products Co. LLC v. Adobe Systems Inc. et al*. 171 F. Supp. 1075 (C. D. Cal. 2001)

20  (holding packaging language that stated "NOTICE TO USERS: This product is

21  offered subject to the license agreement" did not create a license).  Moreover, mere

22  packaging, even if far more extensive than Plaintiffs have shown here, would not

23  create a restrictive license because there is no assent by the authorized retailers or

24  the subsequent retail purchasers like Redbox. As the court held in *UMG*:

25         It is one thing to say, as the statement does, that
          'acceptance' of the CD constitutes an agreement to a
26

27  ─────────────────────
[2] In *UMG*, the media at issue were promotional, however, the Court applied the first
28  sale doctrine for wholly independent reasons. *Id.* at 1182.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

license and its restrictions, but it is quite another to maintain that 'acceptance' may be assumed when the recipient makes no response at all. *This record reflects no responses. Even when the evidence is viewed in the light most favorable to UMG, it does not show that any recipients agreed to enter into a license agreement with UMG when they received the CDs.*

Because the record here is devoid of any indication that the recipients agreed to a license, there is no evidence to support a conclusion that licenses were established under the terms of the promotional statement.

*Id.* at 1182 (emphasis added). Plaintiffs also fail to show that they impose "sufficient incidents of ownership" by controlling the digital codes after sale "to be sensibly considered the owner" of the digital copies. *Id.* at 1183 (citing *Krause v. Titleserv. Inc.*, 402 F.3d 119, 124 (2d Cir. 2005)). Plaintiffs' primary witness admitted that she does not know how many codes have been sold, how many codes have been redeemed, or whether Plaintiffs do anything to track the codes that are included in the Combo Packs. Marinelli Dep. at 88:10–25; 89:1–25; 90:1–4.

Here, Plaintiffs' real complaint is that Redbox unbundles the three items contained in the Combo Packs and sells the code separately. It does not suggest that Redbox is prohibited from reselling the entire combo pack, for example. But there is no stated prohibition against, or enforceable contract or license prohibiting, unbundling the products that Redbox purchases from retailers. Even if, contrary to fact, such a license existed, it would not vitiate Redbox's rights under Section 109(a). For example, in *Burke & Van Heusen, Inc. v. Arrow Drug, Inc.*, 233 F. Supp. 881, 884 (E.D. Pa. 1964), the court found that, even in the face of a written agreement to not to sell copyrighted records unless they were sold as a bundle with another product, the sale of the copyrighted work separate from another product did not constitute copyright infringement. In *Burke & Van Heusen*, the copyright holder granted to a third party, Beecham Products, Inc., "a restrictive license for the use of

1   the compositions on long playing records which were to be used only as a premium
2   in connection with the sale of certain shampoo." Beecham sold the records with the
3   shampoo to the defendant who resold the record separately from the shampoo. *Id.*
4   The plaintiff sued for copyright infringement. The court held that, notwithstanding
5   a restrictive written license signed by the copyright holder and the intermediary
6   owner of the copyrighted music, the subsequent purchaser was not liable for
7   copyright infringement. *Id.* As in *Van Heusen*, title to the copies transfers from
8   Plaintiffs when it sells Combo Packs to authorized distributors. When Redbox
9   lawfully purchases these products, Plaintiffs' rights are exhausted and Redbox has
10  the full and complete right to sell the items.

11  **B.    No Enforceable Contract Limits Transfer of the Codes**

12      Recognizing that it cannot meet the standard for a license, Plaintiffs next
13  argue that there is a contract prohibiting transferring the codes separately from the
14  discs. However, Plaintiffs have not identified any cases that suggest a copyright
15  owner may overcome the restriction of Section 109(a) by way of a contractual
16  agreement that fails to meet the requirements of a license. Indeed, the standards set
17  out in *UMG* would be meaningless if this were the case.

18      But even if Plaintiffs could somehow bypass the first sale doctrine, Plaintiffs
19  have not offered evidence suggesting that such a contract was formed in this case.
20  As an initial matter, the only alleged terms that are proposed at the time of sale are
21  those on the outside of a handful of the asserted packages. Yet under California
22  law, such hypothetical "shrink wrap" terms do not form a valid contract without an
23  express notification to the customer that opening the package constitutes acceptance
24  of the terms and conditions. *Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279,
25  1287 (9th Cir. 2017). "Under these circumstances, California's general rule that
26  silence or inaction does not constitute acceptance is binding." *Id.* Plaintiffs have not
27  shown the law is otherwise elsewhere either. Likewise, nothing on the packaging
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  indicates that the contract would be with plaintiff Buena Vista Home

2  Entertainment, Inc, which is identified only as the distributor.

3      Moreover, the phrase "codes are not for sale or transfer" does not impose the

4  restrictions Plaintiffs seek in this case. Plaintiffs interpret those seven words to

5  somehow result in a complex decision-tree of when and how a customer may

6  dispose of the goods sold in the Combo Packs. For example, Plaintiffs' declarant

7  testified that a customer does not violate the seven magic words, "Codes are not for

8  sale or transfer," when giving the Combo Packs as a gift, even though the codes are

9  transferred in doing so. Marinelli Dep. 135:11–17. But Plaintiffs absurdly conclude

10 that a customer *would* violate that phrase by giving away the DVD and Blu-Ray but

11 retaining the code for himself, even though the code is never sold or transferred. *Id.*

12 at 136:6–17. She also claimed that downloading the movie first and then selling the

13 DVD later would violate the purported contract. *Id.* at 135:21–136:5. Plainly,

14 neither retail customers nor Redbox agreed to these undisclosed and unimaginable

15 interpretations of the seven words when purchasing Combo Packs.

16     Plaintiffs also argue that there are contract terms imposed after-the-fact by

17 the terms and conditions found on the two websites where users download the

18 digital copy. However, Plaintiffs' declarant admitted that these terms are not found

19 on the packaging when the Combo Packs are purchased, but are allegedly

20 incorporated by reference to websites on the package in language printed so small

21 that even she could not read it at her deposition. *Id.* at 197:21–198:8. Even worse,

22 consumers who by Combo Packs online never see the back side of the packaging

23 where the alleged terms are stated, causing Ms. Marinelli to concede that "perhaps

24 we need to do a better job." *Id.* at 212–217. This falls woefully short of the

25 requirements a for shrink-wrap license. *See Norcia*, 845 F.3d at 1287; *see also*

26 *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1069 (S.D. Cal. 2015)

27 (terms of service not binding unless customer given "reasonable notice").

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Even if the websites could impose additional terms, the websites here do not.

2    On the first website, RedeemDigitalMovie.com, the website claims users must own

3    the "physical product" when they redeem a code. However, nothing on that website

4    explains what constitutes the "physical product," and elsewhere on the website,

5    Disney advises customers: "Note—Redeem Digital Movie titles do NOT require a

6    disc for Digital Movie redemption." See Geibelson Decl. Ex. E (emphasis in

7    original). Moreover, Ms. Marinelli testified that the card on which the digital code

8    is printed is considered part of the "physical product." Marinelli Dep. at 62:23:25;

9    63:1–5. That's the same insert that Redbox removes from the Combo Pack and

10   resells to its customers. Chamberlain Decl. ¶¶ 7–8. Thus, even if this vague

11   condition were enforceable, a customer who obtains the card insert from Redbox

12   can truthfully represent that they own the "physical product."

13    On the second website, which is owned by Movies Anywhere LLC, the

14   restriction is equally vague, stating that a user must possess a "Movies Anywhere-

15   eligible physical product that is owned by you." *See* Klaus Decl. Ex. B at ¶ 3(e).

16   Again, that physical product references the card insert that is printed by Disney and

17   resold by Redbox. Marinelli Decl. ¶ 4; Klaus Decl. Ex. 32. These alleged terms of

18   service also suffer from another major flaw—the terms are with Movies Anywhere,

19   LLC, which is not a plaintiff in this case. While Plaintiffs claim they are a

20   "beneficiary" of those terms, nothing in the Movies Anywhere terms of service

21   identify Plaintiffs as third-party beneficiaries or express any understanding that they

22   are intended to benefit from its terms. *See Norcia*, 845 F.3d at 1290–91 (plaintiff

23   bears burden of showing that parties to contract intended the contract to benefit

24   plaintiff). Indeed, the only third-party beneficiaries identified are Apple, Google,

25   and Microsoft. Ex. B at ¶ 9(d). By expressly recognizing those companies but not

26   Plaintiffs, the contract itself forecloses the argument that Plaintiffs are intended

27   beneficiaries under the principle of *expressio unius est exclusio alterius* (the

28   inclusion of one thing implies exclusion of others). *See White v. Western Title Ins.*

*Co.* 40 Cal.3d 870, 881–882, fn. 4 (1985) (holding principle applies to contact interpretation). In any event, Plaintiffs offered no evidence that they are intended beneficiaries. Thus, Plaintiffs lack standing to assert a breach of contract.

### C.   There is No Contributory Infringement

Next, Plaintiffs argue that the two websites' terms of service constitute a "condition precedent" to downloading the already-purchased movie, the violation of which constitutes contributory infringement of copyright. Based on this theory, Plaintiffs attempt to transform downloading the movie they already promised to deliver into a "reproduction" and argue that their reproduction rights, not their distribution rights, are violated. They cite *MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928, 939 (9th Cir. 2010) as "explaining that violation of a condition precedent exceeds the scope of the license." As discussed above, however, there is no license and even Plaintiffs do not claim that one was created. But even— contrary to fact—had a license been created here, *MDY Indus.* itself states that not all violations of a contract or license result in copyright infringement. Rather, the Ninth Circuit explained that "the potential for infringement exists only where the licensee's action (1) exceeds the license's scope (2) in a manner that implicates one of the licensor's exclusive statutory rights." *Id.* at 940. Here, Plaintiffs sold their digital movies with the full knowledge and expectation that that copy would be delivered by electronic download. No second copy is being created. As such, there is no unlawful "reproduction," only a lawful distribution subject to Section 109.

Plaintiffs' case rests on the mistaken belief that the first sale doctrine never applies to digital copies. Marinelli Dep. 128:15–129:7. As Plaintiffs' own authority notes, however, the first sale doctrine applies to digital copies so long as the resale is of the "particular copy" that was sold by the copyright owner and not a new, unauthorized digital (second) copy created by the consumer. *See Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 656 (S.D.N.Y. 2013) ("Section 109(a) still protects a lawful owner's sale of her 'particular' phonorecord, be it a computer

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    hard disc, iPod, or other memory device onto which the file was originally

2    downloaded."). Here, Redbox selling the code *before* the digital copy is

3    downloaded is no different from Redbox using the code to download the digital

4    copy onto a portable memory device and reselling that device itself. *See id.* It is the

5    "particular copy" that Plaintiffs agreed to sell and is not and cannot be contributory

6    infringement. Marinelli Dep. 155:1–4 (each code can only be used once).

7       None of Plaintiffs' cases on contributory infringement are relevant because

8    all of those cases involve a user creating a new, unauthorized digital copy. For

9    example, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001),

10   involved a peer-to-peer file sharing system that allowed users to make unlimited

11   copies of a single MP3 music file, which were then distributed to other users.[3] Here,

12   there is no new copy being made by either Redbox or the consumer. Plaintiffs and

13   their websites are only delivering the "particular" digital copies that they agreed to

14   sell as part of their Combo Packs.

### D.    Plaintiffs Are Engaged In Copyright Misuse

16       By attempting to overextend their copyrights' reach to control prices and

17   limit how their products are sold in the downstream market, in violation of the first

18   sale doctrine, Plaintiffs have committed copyright misuse. The copyrights are thus

19   unenforceable. *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 695 (9th Cir.

20   2015) (Wardlaw, J., concurring); *Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516,

21   520 (9th Cir. 1997); *DSC Communications Corp. v. DGI Techs., Inc.*, 81 F.3d 597,

22   601 (5th Cir. 1996); *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977–79 (4th

23   Cir. 1990). Copyrights confer limited monopoly power, but "the granted monopoly

24

25   [3] *See also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)

26   (sale of counterfeit copies of recordings at a swap meet); *Capital Records LLC v. ReDigi Inc.* 934 F. Supp. 2d 640, 658 (S.D.N.Y. 2013) (similar to *Napster,* sale of

27   new digital copies of previously sold MP3s); *Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923 (N.D. Cal. 1996) (sale of pirated versions of video games).

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   power does not extend to property not covered by the patent or copyright."

2   *Lasercomb Am., Inc.*, 911 F.2d at 976 (citations omitted). Copyright misuse

3   involves the impermissible expansion of monopoly, but "need not be a violation of

4   antitrust law in order to comprise an equitable defense to an infringement action."

5   *Lasercomb Am., Inc.*, 911 F.2d at 978 (4th Cir. 1990). Thus, it is an "abuse of

6   process" where a copyright owner [uses] an infringement suit to obtain property

7   protection that [] copyright law clearly does not confer ...." *Omega*, 776 F.3d at

8   700 (Wardlaw, J., concurring). Consequently, "[t]he defense is often applied when

9   a defendant can prove either: (1) a violation of the antitrust laws; (2) that the

10  copyright owner otherwise illegally extended its monopoly; or (3) that the

11  copyright owner violated the public policies underlying the copyright laws." *Id.* The

12  imposition of unduly burdensome licensing agreements that restrict competition can

13  violate public policy and constitute copyright misuse. *See, e.g., Practice Mgmt.*

14  *Info. Corp.*, 121 F.3d at 521; *Lasercomb Am., Inc.*, 911 F.2d at 978; *Alcatel USA,*

15  *Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 793 (5th Cir. 1999) (Alcatel USA, Inc., was

16  formerly DSC Communications Corp.).

17       Here, Plaintiffs admit they do not sell digital movie codes as "freestanding"

18  products. Marinelli Decl. ¶ 22. Instead, consumers are required to buy Combo

19  Packs to obtain a digital movie code. *Id.* They contend that, when consumers are

20  allowed to buy codes sold from Redbox, they will sell fewer Combo Packs.

21  Marinelli Decl. ¶16. This plainly demonstrates, and Plaintiffs admit, that they are

22  attempting to prohibit downstream resale or transfer of their products. They are

23  attempting to limit resale of physical DVD and Blu-ray discs, by requiring

24  consumers to retain them to access digital movies. And they admit that they are

25  attempting to restrain competition because Redbox is competing downstream and

26  offering lower prices. Marinelli Decl. ¶ 11. All of these misuse the limited

27  monopoly in copyright.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Here, Plaintiffs seek to enforce what they contend are two separate

2    agreements that restrain how their products are sold and the price at which they are

3    sold. One is at the point of sale and one is at the online distributors. While, as

4    discussed *supra*, Redbox disagrees and does not concede that any agreement exists,

5    assuming, *arguendo*, that such restrictions were present in the marketplace, it would

6    be anticompetitive and against public policy under the rule established in the

7    foundational cases that recognize the copyright misuse defense in the Ninth Circuit,

8    *Practice Mgmt. Info. Corp.*, and in the Fourth Circuit, *Lasercomb*.

9    In *Practice Mgmt. Info. Corp.*, the American Medical Association (AMA)

10   developed and published a coding system called the CPT for medical procedures

11   and asserted copyright over that publication. *Practice Mgmt. Info. Corp.*, 121 F.3d

12   at 516–17. The AMA then licensed the CPT to the government, but the license

13   restricted the government from using other coding systems offered by competitors.

14   *Id.* The court concluded that "the AMA misused its copyright" by using the

15   exclusivity provision in the license to effectively exclude the competition. *Id.* at

16   520. In other words, the license terms "gave the AMA a substantial and unfair

17   advantage over its competitors." *Id.* at 521. In *Lasercomb*, which the Ninth Circuit

18   adopted in *Practice Mgmt.*, a licensing agreement with an embedded non-compete

19   clause was at issue. 911 F.2d at 973. The court reasoned that the while "Lasercomb

20   undoubtedly has the right to protect against copying of [its] code," the licensing

21   went "much further" than it needed to and restricted competition. *Id.* at 978.

22   Both *Practice Mgmt. Info. Corp.* and *Lasercomb* found that, while not

23   necessarily antitrust violations, the unduly restrictive licenses were copyright

24   misuse that violated public policy. *Practice Mgmt. Info. Corp.*, 121 F.3d at 521

25   ("By agreeing to license the CPT in this manner, the AMA used its copyright 'in a

26   manner violative of the public policy embodied in the grant of a copyright'")

27   (quoting *Lasercomb Am., Inc.*, 911 F.2d at 977). The copyright holders in *Practice

28   Mgmt. Info. Corp.* and *Lasercomb* attempted to use licensing agreements to restrict

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

REDBOX'S OPPOSITION TO
PRELIMINARY INJUNCTION

competition. In each case, it was deemed copyright misuse to use unduly restrictive licensing terms to restrain competition. Such is the case here, where Plaintiffs are attempting to assert purported agreements to fix prices and prevent Redbox from offering lower prices to consumers. Marinelli Decl. ¶ 11.

Moreover, the policy considerations behind the first sale doctrine strongly support applying the copyright misuse doctrine here. Like the publisher in *Bobbs-Merrill*, Plaintiffs hold copyrights to creative works. They then affixed purported resale restrictions on the rear-facing portion of the combo pack, the same page that bears the copyright. In *Bobbs-Merrill*, the resale restriction was intended to prevent resale from occurring at a price that the copyright holder determined was too low, rather than the market price set at retail. 210 U.S. at 341. This is exactly what Plaintiffs are attempting to do to Redbox, namely, impose an artificial price floor by eliminating competition, which Plaintiffs perversely call "below market prices." Marinelli Decl. ¶ 19; Marinelli Dep. 168:10–12. Plaintiffs are therefore attempting the skirt both the spirit and the letter of *Bobbs-Merrill* through the fiction of a reproduction claim and the deliberate ignorance that the purported reproduction is the same digital copy it sold. Plaintiffs are, in reality, in exactly the same position as the publisher in *Bobbs-Merril*, and their claims constitute misuse because they seek to expand Plaintiffs' copyrights beyond their permissible scope.

**E.   Plaintiffs Will Not Succeed On Their State Law Claims**

Plaintiffs are also not entitled to a preliminary injunction on their state law causes of action.

**1.   *Redbox's advertising and sale of digital copies are immunized by the UCL's and FAL's "Safe Harbor" and the Copyright Act's preemption provision.***

The crux of every one of Plaintiffs' claims is that Redbox violates the Copyright Act by reselling digital copies of movies it purchases at retail. Because

the first sale doctrine authorizes this behavior, the transactions are protected by the UCL and FAL's safe harbor doctrine, and the claims are preempted.

"A business practice cannot be unfair if it is permitted by law." *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999). As the California Supreme Court explained in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 182 (1999): "Although the unfair competition law's scope is sweeping, it is not unlimited. ... When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." The same principle applies to, and bars, Plaintiffs' FAL claim. *See Ebner v. Fresh Inc.*, 2013 U.S. Dist. LEXIS 188889, at *8–14 (C.D. Cal. Sep. 11, 2013) (compliance with federal law about quantity of lip balm).

The safe harbor doctrine mirrors the Copyright Act's preemption provision, 17 U.S.C. § 301. It "explicitly preempts state laws that regulate in the area of copyright, stating that 'all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 … are governed exclusively by this title.'" *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1150 (9th Cir. 2008) (quoting 17 U.S.C. § 301(a)). If Redbox is permitted to sell the digital copies it purchased, that right would dispose of every state cause of action pled. Thus, the claims asserted under state law are equivalent to those protected by the Copyright Act. For example, when Xerox claimed an unauthorized copy of its copyrighted work was being incorporated into an Apple product, Xerox's unfair competition claim alleging confusion was preempted. *Xerox Corp. v. Apple Comput., Inc.*, 734 F. Supp. 1542, 1543 (N.D. Cal. 1990). And when Motown claimed that Hormel's use of an image and the music of the Supremes in a "Dinty Moore" commercial infringed its copyright, its unfair competition claim alleging confusion was preempted. *Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236 (C.D. Cal. 1987). Here, Plaintiffs

18

REDBOX'S OPPOSITION TO
PRELIMINARY INJUNCTION

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

allege Redbox is selling an unauthorized copy of copyrighted works and causing confusion to consumers. As in *Xerox* and *Motown*, these claims here are preempted.

### 2.   *Plaintiffs lack standing to assert UCL or FAL violations*

UCL and FAL plaintiffs must have lost money or property to have standing to sue. Cal. Bus. & Prof. Code §§ 17204, 17535. Plaintiffs have not met this burden. Plaintiffs have no evidence of even a single digital code being purchased from Redbox instead of one of their licensees. Marinelli Dep. 88:14–24. Instead, their evidence suggests the alleged deception of consumers *may* cause a loss in the future. Marinelli Decl. ¶ 12. Even the conclusory assertion Redbox's conduct affects Plaintiffs' "goodwill" concerns only its "negotiating position with its licensees for future license agreements," none of which is ripe to cause harm any time soon, and future relationships with potential consumers. Marinelli Dep. 41:14–43:16, Marinelli Decl. ¶ 14. At best, the claimed harm concerns a "contingent expectancy of payment from a third party" that is not recoverable under the UCL and FAL, and does not support standing in the first instance. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003); *see also Walker v. USAA Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1172 (E.D. Cal. 2007) (requiring "prior possession or a vested legal interest in the money or property allegedly lost.").

The evidence shows only that Plaintiffs sold an unspecified number of Combo Packs into the stream of commerce. Redbox bought some of them and resold a small fraction of their digital movie codes, then meticulously repackaged and sold the original codes to customers, and never to more than one person each. Chamberlain Decl. ¶¶ 7–8. Plaintiffs have not shown they lost a single sale, or a single dollar, from Redbox's resale of a small fraction of the digital movie copies Plaintiffs themselves put into the stream of commerce for resale to consumers and that they fail to track thereafter. Without such a showing, an unrealized potential for future harm is insufficient to show the present injury and loss of money or property required for standing under Sections 17204 and 17535.

REDBOX'S OPPOSITION TO
PRELIMINARY INJUNCTION

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

### 3. *Plaintiffs will fail on their 17500 claim*

Plaintiffs' terse argument about Section 17500 concerns consumers' alleged confusion about their right to legally download the digital copy of the movie they purchased from Redbox. Plaintiffs have not offered any evidence that any person who downloaded a movie using a code they bought from Redbox did so improperly. Both because the first sale doctrine permits Redbox's resale of the digital copy of the movie, and because Plaintiffs do not track the ownership of the digital codes providing access to those digital copies, Plaintiffs have not shown and cannot show any customer did not receive what they were sold. And, as set forth above, Plaintiffs have no injury or loss of money or property as a result of Redbox's statements either. Thus, there is no likelihood of success under Section 17500.

### 4. *The FAL and UCL do not apply extraterritorially and cannot support an injunction addressing conduct outside California.*

The California Legislature is presumed not to intend its statutes to apply beyond the state's borders. *Norwest Mortgage, Inc. v. Super. Ct.*, 72 Cal.App.4th 214, 222, 85 Cal.Rptr.2d 18 (1999). Thus, statutes are not construed to regulate conduct outside the state unless a contrary intention is clearly expressed or reasonably inferred from the statute. *Diamond Multimedia Systems, Inc. v. Super. Ct.*, 19 Cal.4th 1036, 1059–1060, 80 Cal.Rptr.2d 828 (1999). No such intention exists with respect to the FAL and UCL, and neither can be applied extraterritorially.

The False Advertising Law expressly proscribes only false advertising that is made or disseminated, or caused to be made or disseminated, "before the public in this state" or "from this state before the public in any state." And the California Supreme Court has observed that: "Neither the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially. Accordingly, the presumption against extraterritoriality applies to the UCL in full force." *Sullivan v. Oracle Corp.*, 51

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Cal. 4th 1191, 1207 (2011). Neither statute provides any basis for an injunction

2   controlling conduct outside California of a company operating from Illinois and

3   Washington. Chamberlain Decl. ¶ 2.

**5.   *Plaintiffs have not established tortious interference***

5   Plaintiffs are not entitled to an injunction on the claim for tortious

6   interference. Putting aside that Plaintiffs' motion only addresses California law

7   (ignoring the 49 other states in which Redbox and Plaintiffs do business),

8   California does not recognize a general claim for "tortious interference." Rather,

9   California recognizes the distinct claims of "intentional interference with

10   contractual relations" and "intentional interference with prospective economic

11   advantage." *See Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55

12   (1998). Here, Plaintiffs have neither alleged nor proven either.

13   Plaintiffs' motion appears to rest their argument on the first type of

14   interference, whereby a third party induces a party to a contract to commit a breach

15   of an existing contract. See Dkt. 13 at 16:28–17:1. However, such a claim requires

16   Plaintiffs to prove the existence of a "valid contract between plaintiff and a third

17   party." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

18   Here, as discussed above, there is no contract between customers and Plaintiffs.

19   Moreover, Plaintiffs further admit that consumers do not consent to the terms of

20   service of the websites until going online to redeem a Code. Yet the law is clear that

21   the interference alleged must be with an "existing contract" with the plaintiff.

22   *Quelimane*, 19 Cal. 4th at 55. Thus, Plaintiffs' assertion that Redbox "induces a

23   breach of these terms of service when it sells Codes" is, chronologically speaking,

24   impossible. At the point in time that a consumer acquires a Code from Redbox,

25   there is no valid contract with which Redbox could interfere.

26   This temporal distinction is important. California law gives an existing

27   contract "greater solicitude" than a potential contract. *Id.* Thus, the requirements for

28   proving interference with prospective contract are greater. For example, to establish

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

interference with a prospective contract, the plaintiff must prove that it actually lost a customer and that it is "reasonably probable" that he would have gained that customer but for the defendant's conduct. *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987); *see also Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590, 620 (1989) (holding plaintiff-doctor failed to state an interference claim where he failed to allege he lost patients as a result of defendant's conduct). Here, Plaintiffs do not offer any evidence that Redbox prevented Plaintiffs from gaining any customers. If anything, Redbox has apparently caused Disney to gain customers it does not want (i.e. Redbox's customers), which does not satisfy the elements of this claim.

In addition, the tort of interference with a prospective contract also requires that Plaintiffs allege and prove that Redbox's conduct was "independently wrongful." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158 (2003). Moreover, the California Supreme Court has emphasized that mere competition in the open market does not satisfy the wrongfulness element. *Id.* Plaintiffs ignore their burden of proving both these additional elements.

### 6.   *Plaintiffs will fail on their 17200 claim*

To prove a 17200 violation for unlawfulness, Plaintiffs must show a violation of another law. *Farmers Ins. Exchange* v. *Superior Court,* 2 Cal.4th 377, 383 (1992). Here, Plaintiffs claim tortious interference and a violation of 17500 violation. However, where, as here, there is no merit to the underlying violation, there is no violation of the unfair competition law either. *Renick v. Dun & Bradstreet Receivable Management Services*, 290 F.3d 1055, 1057–1058 (9th Cir. 2002). As discussed above, there is no merit to the claims for tortious interference or false advertising under Section 17500. Additionally, claims of tortious interference cannot support a UCL claim.[4] California courts have explicitly and

---

[4] An action under the UCL "is not an all-purpose substitute for a tort or contract action." *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 173 (2000). While recognizing the cited comment in *CRST Van Expedited, Inc. v.*

implicitly rejected the interpretation of the term "unlawful" as including torts not based upon express law. *See Kenneth Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965 (1997) (rejecting 17200 unlawfulness claim based upon strict products liability and breach of implied warranty); *Isaiah Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612 (1993) (rejecting UCL claim while allowing breach of contract claim).

## V.   THE BALANCE OF HARMS SHARPLY FAVORS REDBOX

The extraordinary remedy of a preliminary injunction can be justified only if Redbox's continued operation poses an imminent risk of irreparable injury—that is, injury will occur before this litigation is resolved that cannot be remedied with money damages—that outweighs the harm to Redbox by imposing the injunction. Plaintiffs bear the burden of establishing their irreparable harm. Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22; *Flexible Lifeline Sys.*, 654 F.3d at 998 ("[P]resuming irreparable harm in a copyright infringement case is inconsistent with, and disapproved by, the Supreme Court's opinions in *eBay* and *Winter*."). "In some instances, damage to reputation or goodwill, because it is difficult to calculate, qualifies as irreparable harm." However, vague claims that the plaintiff "may experience a loss of good will and customer confusion" are insufficient. *Gold Club-SF, LLC v. Platinum SJ Enter.*, 2013 U.S. Dist. LEXIS 134379, at *34–35 (N.D. Cal. Sep. 18, 2013) (citing *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (CD. Cal. 2007)).

Here, Plaintiffs offer no evidence that their customer base has been affected

---

*Werner Enters.*, 479 F.3d 1099, 1107 (9th Cir. 2007), its citation of *Korea Supply*, 29 Cal. 4th at 1143 and *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55-56 (1998) do not support that conclusion. *Korea Supply* "'borrowed' from the federal Foreign Corrupt Practices Act," and did not discuss tortious interference in the same part of the opinion. *Quelimane* borrowed violations of the Cartwright Act and false advertising, *id.* at 51-55; tortious interference was an alternative cause of action and not a predicate to unfair competition, *id.* at 54-55.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

by Redbox's digital movie sales. It does not even acknowledge that the market segment Redbox serves, and its unique mode of delivery, are markedly different from the market segments served by Plaintiffs' licensees. Smith Decl. ¶ 6. Plaintiffs also fail to balance the claimed prospective harm against the benefit of acquiring new customers (and new customer data) from Redbox's customer base. *See Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) ("[E]stablishing a threat of irreparable harm in the indefinite future is not enough."). Further, the record lacks any evidence that monetary relief would be inadequate. Between Plaintiffs' indubitably meticulous records, and knowledge of their licensing fees, monetary damages may readily be calculated and paid if liability is ultimately found at trial. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339–40 (Fed. Cir. 2012) (no irreparable harm because the plaintiff "broadly and extensively" pursued license fees for its technology and "no fact finder could reasonably conclude that [plaintiff] would be irreparably harmed by the payment of a royalty (a licensing fee)").

In addition, Plaintiffs have been unable to offer evidence of any actual complaints from their licensees concerning Redbox's sales. In response to a discovery request for communications representing complaints from licensees, Plaintiffs only produced two written questions—not complaints—from their licensees asking about Disney's position concerning Redbox. *See* Appendix of Sealed Documents Exs. B, C. And Ms. Marinelli testified at her deposition that Disney's negotiations with its licensees have not been affected by Redbox's behavior, that conversations about Redbox have been brief at most, and that after Plaintiffs commenced this lawsuit, the licensees have not brought the issue up again. Marinelli Dep. at 23:24–27:15; 34:6–36:16; 171:10–22. Thus, a preliminary injunction is not necessary to preserve Plaintiffs' relationships with their licensees.

In sum, Plaintiffs have failed to meet their burden of establishing irreparable harm and are therefore not entitled to a preliminary injunction. In contrast, the harm

1   to Redbox would be clear and substantial. Redbox has invested considerable time

2   and resources in launching the digital code product line at a cost to Redbox of over

3   $700,000. Smith Decl. ¶ 15. An injunction would deprive Redbox from realizing

4   any return on that investment and would deprive Redbox of any potential profits.

5   An injunction would also delay Redbox's entry into the market for digital

6   downloads while this case is pending.

7        The public interest is also not in favor of an injunction. Plaintiffs admit that

8   the goal of this lawsuit is to *increase* the prices that customers must pay for digital

9   copies. Marinelli Decl. ¶ 19. But the public has an interest in affordable

10  entertainment unaffected by Plaintiffs' abuse of their limited monopoly rights. *See*

11  *Bobbs-Merrill Co.*, 210 U.S. at 341; *Omega S.A. v. Costco Wholesale Corp.*, 776

12  F.3d 692, 695 (9th Cir. 2015) ("copyright holders cannot use their rights to fix

13  resale prices in the downstream market"); *McGuire v. Times Mirror Co.*, 405 F.

14  Supp. 57, 65 (C.D. Cal. 1975) ("[T]he public interest … is best served by providing

15  quality goods at the lowest possible price."). Because Plaintiffs admit that

16  consumers would be harmed, the Court should decline to grant an injunction.

17  DATED: January 16, 2018          ROBINS KAPLAN LLP

18

19                                  By: /s/ Michael A. Geibelson
                                        Michael A. Geibelson
20
                                    ATTORNEYS FOR DEFENDANT
21                                  REDBOX AUTOMATED RETAIL, LLC

22

23

24

25

26

27

28

88666830.4                          25                    REDBOX'S OPPOSITION TO
                                                         PRELIMINARY INJUNCTION