GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
ROSE LEDA EHLER (State Bar No. 296523)
rose.ehler@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
carolyn.luedtke@mto.com
STEPHANIE GOLDFARB HERRERA (State Bar No. 313887)
stephanie.herrera@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone:   (415) 512-4000
Facsimile:    (415) 512-4077

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DISNEY ENTERPRISES, INC., et al.<br><br>        Plaintiffs,<br><br>   vs.<br><br>REDBOX AUTOMATED RETAIL, LLC,<br><br>        Defendant. | Case No. 2:17-cv-08655-DDP (AGRx)<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:  Hon. Dean D. Pregerson<br>Date:   February 5, 2018<br>Time:   10:00 a.m.<br>Ctrm:   9C<br><br>Filed concurrently herewith:<br>(1)  Declaration of Jason Curtis and exhibit thereto;<br>(2) Supplemental Declaration of Janice Marinelli; and<br>(3) Supplemental Declaration of Rose Leda Ehler and exhibits thereto.<br><br>Trial Date:      None Set |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 3

I.   REDBOX'S FIRST-SALE AND COPYRIGHT MISUSE DEFENSES
     FIND NO SUPPORT IN THE LAW ................................................. 3

     A.   The First-Sale Defense Does Not Apply Because Codes Are Not
          "Copies" Of Movies ............................................................... 3

     B.   Redbox's Copyright Misuse Arguments Are Baseless ................. 5

II.  REDBOX FAILS TO COUNTER DISNEY'S SHOWING OF
     LIKELY SUCCESS ...................................................................... 7

     A.   Redbox Is Bound By And Has Violated The Terms Of Disney's
          Box-Top Contracts Prohibiting The Sale Of Codes ..................... 7

     B.   Redbox Is Contributorily Liable For Its Customers'
          Unauthorized Copying ............................................................ 9

     C.   Redbox Misconstrues Disney's State-Law False Advertising
          Claims And Misunderstands The Applicable Law ...................... 13

          1.   The Deceptive Advertising Claims Are Not Preempted Or
               Subject To A "Safe Harbor" .......................................... 13

          2.   Disney Has Standing To Seek Relief Under The UCL And
               FAL Because Redbox Is Harming Disney's Goodwill ......... 14

          3.   The UCL And FAL Claims Do Not Require
               Extraterritorial Application Because There Is A Sufficient
               Nexus Between Redbox's Misrepresentations And
               California ................................................................... 14

     D.   Disney Will Succeed On Its Tortious Interference Claim Because
          Redbox Interferes With Contracts That Disney Already Has With
          Its Customers .......................................................................... 15

     E.   Disney Is Likely To Succeed On Its UCL "Unlawful" Claim
          Because Redbox Violates State Law .......................................... 16

III. REDBOX IGNORES OR DOWNPLAYS THE CLEAR EVIDENCE
     THAT ITS ILLEGAL CONDUCT IS IRREPARABLY HARMING
     DISNEY'S RELATIONSHIPS WITH LICENSEES AND
     CUSTOMERS ............................................................................ 16

     A.   The Harm To Disney's Relationships With Licensees And
          Customers Is Imminent And Real, Not Speculative .................... 16

**TABLE OF CONTENTS**
(continued)

**Page**

1. Redbox's Illegal Conduct Threatens Disney's Goodwill And Relationships With Its Licensees ..........................................16

2. Redbox Ignores Record Evidence Of Consumer Confusion......18

3. Redbox Cherry Picks Evidence In Arguing That Its Sale Of Codes Is Not Hurting Disney's Business ..............................19

B. Redbox's Claim That Its Illegal Conduct "Benefits" Disney Is Wrong And Disingenuous At Best ........................................20

C. Contrary To Redbox's Claim, The Harms To Disney Are Neither Easily Quantified Nor Remedied With Monetary Damages ...............22

IV. REDBOX'S CLAIMED HARDSHIP IS LEGALLY IRRELVANT............23

V. REDBOX GETS THE PUBLIC INTEREST BACKWARDS......................24

CONCLUSION...............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ................................................................. 2, *passim*

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011) .................................................................. 6, 7, 24

*Apple Inc. v. Psystar Corp.*,
673 F. Supp. 2d 943 (N.D. Cal. 2009) ......................................................... 24

*Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l Inc.*,
421 F.3d 981 (9th Cir. 2005) ..................................................................... 9, 13

*Bobbs-Merrill Co. v. Straus*,
210 U.S. 339 (1908) ......................................................................................... 4

*Burke & Van Heusen, Inc. v. Arrow Drug, Inc.*,
233 F. Supp. 881 (E.D. Pa. 1964) .................................................................... 4

*Capitol Records, LLC v. ReDigi Inc.*,
934 F. Supp. 2d 640 (S.D.N.Y. 2013) ............................................................. 4

*Disney Enters., Inc. v. VidAngel Inc.*,
869 F.3d 848 (9th Cir. 2017) .................................................................. *passim*

*Disney Enters., Inc. v. VidAngel*,
No. 2:16-cv-04109-AB-PLA (C.D. Cal. Aug. 10, 2017) ................................. 5

*DSC Commc'ns Corp. v. DGI Techs., Inc.*,
81 F.3d 597 (5th Cir. 1996) ............................................................................. 7

*Ehret v. Uber Techs., Inc.*,
68 F. Supp. 3d 1121 (N.D. Cal. 2014) ........................................................... 14

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ...................................................................... 22

*Klamath Water Users Protective Ass'n v. Patterson*,
204 F.3d 1206 (9th Cir. 1999) ...................................................................... 11

-iii-

1
2

# TABLE OF AUTHORITIES
## (continued)

Page(s)

3
4
*Lasercomb America, Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990) ................................................................. 7

5
6
*London-Sire Records, Inc. v. Doe 1*,
    542 F. Supp. 2d 153 (D. Mass. 2008) .................................................... 5

7
*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010) ............................................................... 15

8
9
*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    454 F. Supp. 2d 966 (C.D. Cal. 2006) ................................................... 5

10
11
12
*Nicole, Inc. v. B.L.K. Int'l, Inc.*,
    No. CV 15-01892-RGK (Ex), 2015 WL 12826459 (C.D. Cal. June
    25, 2015) ............................................................................................... 13

13
14
*Norcia v. Samsung Telecommunications America, LLC*,
    845 F.3d 1279 (9th Cir. 2017) ............................................................... 8

15
16
*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*,
    165 F. Supp. 3d 937 (S.D. Cal. 2016) .................................................. 14

17
*Omega S.A. v. Cosco Wholesale Corp.*,
    776 F.3d 692 (9th Cir. 2015) ................................................................. 7

18
19
*Oracle USA, Inc. v. Rimini Street, Inc.*,
    Nos. 16-16832, 16-16905, 2018 WL 315568 (9th Cir. Jan. 8, 2018) ............... 2, 6

20
21
*Pendleton Woolen Mills, Inc. v. Kraff's Men's Wear Co., Inc.*,
    No. 3:14-CV-628-PK, 2014 WL 7777762 (D. Or. Nov. 21, 2014) ...................... 5

22
23
*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ............................................................... 6

24
25
*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
    121 F.3d 516 (9th Cir. 1997) ............................................................. 6, 7

26
27
*In re Qualcomm Litig.*,
    No. 17-CV-00108-GPC-MDD, 2017 WL 5985598 (S.D. Cal. Nov.
    8, 2017) ................................................................................................ 14

28

-iv-

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Red Baron-Franklin Park, Inc. v. Taito Corp.*,
   883 F.2d 275 (4th Cir. 1989) .................................................................. 3

*Softman Prods. Co. v. Adobe Systems Inc.*
   171 F. Supp. 2d 1075 (C.D. Cal. 2001) ................................................. 4

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) .............................................................. 23

*Ulti-Mate Connectors, Inc. v. Am. Gen. Life Ins.*,
   No. SACV 14-1051-JLS, 2015 WL 12734007 (C.D. Cal. Mar. 27,
   2015) ................................................................................................... 15

*UMG Recordings, Inc. v. Augusto*,
   628 F.3d 1175 (9th Cir. 2011) .............................................................. 4

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ............................................................................. 6

*United States v. Wise*,
   550 F.2d 1180 (9th Cir. 1977) .............................................................. 5

*Valente-Kritzer Video v. Pinckney*,
   881 F.2d 772 (9th Cir. 1989) .............................................................. 13

*Variant Displays, Inc. v. Absolute Exhibits, Inc.*,
   SACV 15-01685-CJC (JCGx), 2016 WL 7486282 (C.D. Cal. May
   31, 2016) ............................................................................................ 13

*Vernor v. Autodesk, Inc.*,
   621 F.3d 1102 (9th Cir. 2010) ............................................................ 12

*Warner Bros. Entm't v. WTV Sys., Inc.*,
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) .............................................. 17

*Winter v. Nat. Res. Defense Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................... 18

**STATE CASES**

*Day v. AT&T Corp.*,
   63 Cal. App. 4th 325 (1998) .............................................................. 13

-v-

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

3

*Golden Eagle Ins. v. Foremost Ins.*,
    20 Cal. App. 4th 1372 (1993) .................................................................. 8

4

5

*Lazar v. Hertz Corp.*,
    69 Cal. App. 4th 1494 (1999) .............................................................. 14

6

7

**FEDERAL STATUTES**

8

17 U.S.C. § 101 ................................................................................. 1, 3

9

17 U.S.C. § 109(a) ........................................................................ 1, 3, 4

10

17 U.S.C. § 301(a) ............................................................................. 13

11

12

**STATE STATUTES**

13

Cal. Civ. Code § 1589 ......................................................................... 8

14

**OTHER AUTHORITIES**

15

Lauren Gensler, *Redbox Parent To Be Taken Private for $1.6 Billion*,
    Forbes (Jul. 25, 2016, 9:14 AM)
    https://www.forbes.com/sites/laurengensler/2016/07/25/redbox-
    coinstar-outerwall-acquisition-apollo-1-6-billion/#40938fb46c45 ...................... 23

16

17

18

19

20

21

22

23

24

25

26

27

28

-vi-

1

**INTRODUCTION**

2      This case has nothing to do with "stifl[ing] competition," imposing "after-the-

3  fact licenses," or "requir[ing] consumers to pay higher prices." Opp. at 1–2. This

4  case is about Redbox flouting the law, interfering with Disney's relationships with

5  customers and law-abiding content distributors, and misappropriating Disney's

6  content to boost Redbox's bottom line. Redbox's claim that the Court can do

7  nothing to stop it distorts the law and the facts.

8      Redbox grounds most of its opposition on a single defense—"first sale" under

9  § 109(a) of the Copyright Act. That defense applies only to the ability of an owner

10  of "a particular copy" of a work to further distribute that copy after the copyright

11  owner has disposed of it. 17 U.S.C. § 109(a). The Copyright Act defines "cop[y]"

12  as a "material object … in which the work is fixed," i.e., "embodi[ed]." *Id*. § 101.

13  A Code is none of these things. It is an alphanumeric passcode printed on a piece of

14  paper that, as Redbox puts it, is merely a "key to unlock the movie that's stored"

15  elsewhere. Supplemental Declaration of Rose Leda Ehler ("Suppl. Ehler Decl.")

16  Ex. U, Chamberlain Dep. 77:2–5. As Redbox readily admits, "[t]here's no movie on

17  the piece of paper." *Id*. Ex. W, Smith Dep. 47:4; *see also id.* Ex. U, Chamberlain

18  Dep. 77:6–16.

19      Redbox is liable for breach of contract because Redbox knows and accepts

20  when it buys Blu-ray/DVD/Digital HD combination packages ("Combo Packs") that

21  "Codes are not for sale or transfer." Declaration of Kelly M. Klaus (Dkt. 15)

22  ("Klaus Decl.") Ex. C. Redbox tries to dismiss this (and other iterations of the same

23  prohibition) as "cryptic and ambiguous words," Opp. at 1, but no Redbox witness

24  will say under oath that Redbox did not understand the prohibition against selling

25  Codes when it bought Combo Packs. As the testimony of Redbox's witnesses

26  makes clear, Redbox simply chose to ignore that language believing it could hide

27  behind its first-sale defense. *See, e.g.*, Suppl. Ehler Decl. Ex. W, Smith Dep.

28  103:16–21. In any event, Redbox knows what the language means now, and has

-1-

1   avowed that it will continue buying Combo Packs and selling Codes indefinitely,

2   unless and until it is enjoined by the Court.

3         Redbox is liable for copyright infringement because it encourages and

4   materially contributes to its customers' unauthorized copying when they download a

5   digital copy of a movie in violation of the condition that the person redeeming the

6   Code also own the physical discs that were part of the Combo Pack.  This is not an

7   "after-the-fact" condition, Opp. at 11, but one the redeemer must satisfy to be

8   entitled to make the downloaded copy.  Without the necessary authorization,

9   Redbox's customers violate Disney's reproduction right, and Redbox is

10   contributorily liable for that infringement.

11         Redbox's final liability defense is the last redoubt of all mass pirates:

12   copyright misuse.  Redbox claims the Combo Pack prohibitions and redemption-site

13   terms are "unduly burdensome" and attempts "to fix prices."  Opp. at 15, 17.

14   Nonsense.  It is not misuse for Disney, the copyright owner, to license the use of its

15   works "only on terms [it] finds acceptable," *A&M Records, Inc. v. Napster, Inc.*

16   (*Napster*), 239 F.3d 1004, 1027 (9th Cir. 2001) (citation omitted), or to use

17   "conditions to control use of copyrighted material," *Oracle USA, Inc. v. Rimini*

18   *Street, Inc.*, Nos. 16-16832, 16-16905, 2018 WL 315568, at *7 (9th Cir. Jan. 8,

19   2018) (citation omitted).  Redbox has not come close to raising a misuse issue.

20         Redbox's efforts to trivialize the harms of its conduct to Disney likewise fail.

21   Disney's licensees did not simply ask "questions" about Redbox's illegal offering.

22   Opp. at 24.  They brought to Disney's attention the unfairness of competing against

23   someone selling Codes to access digital content which the licensees offer only

24   pursuant to contract.  Declaration of Michael Geibelson ("Geibelson Decl.") (Dkt.

25   36, Sealed Exhibits) Exs. B, C; Suppl. Ehler Decl. Ex. X, Marinelli Dep. 25:16–

26   27:16.  The absence of licensee complaints after Disney "commenced this lawsuit,"

27   Opp. at 24, owes to the fact that Disney took the action licensees expected to

28   address Redbox's unauthorized and illegal conduct.  Suppl. Ehler Decl. Ex X,

-2-

Marinelli Dep. 171:13–22, 172:23–173:5.  And, Redbox is not doing Disney or consumers any favors.  Redbox's supposed "meticulous" repackaging of the Codes, Opp. at 19, omits key information that consumers would want to know, such as whether the ultimate download will be standard or high definition and whether the consumer can download the movie to any device.  *See* Suppl. Ehler Decl. Ex. AA.

Disney respectfully submits its motion should be granted.

## ARGUMENT

## I.  REDBOX'S FIRST-SALE AND COPYRIGHT MISUSE DEFENSES FIND NO SUPPORT IN THE LAW

### A.  The First-Sale Defense Does Not Apply Because Codes Are Not "Copies" Of Movies

Redbox treats "first sale" as a silver-bullet defense to "all of Plaintiffs' claims."  Opp. at 2.  That defense is irrelevant here.

The Copyright Act defines the first-sale defense as limiting the copyright owner's exclusive distribution right by excluding from that right the right to authorize the further distribution of a "particular copy" of a work once the owner has disposed of that copy.  17 U.S.C. § 109(a).  Redbox confuses the underlying act of infringement by arguing that this is a claim about distribution.  Opp. at 2.  Redbox's copyright liability, however, arises because of its customers' unauthorized exercise of Disney's *reproduction* right when they download movies.  Because Plaintiffs allege that Redbox violates the reproduction right, the first sale defense is inapplicable.  *See Red Baron-Franklin Park, Inc. v. Taito Corp*., 883 F.2d 275, 280–81 (4th Cir. 1989) ("[T]he first sale doctrine has no application to the rights of the owner of a copyright guaranteed by § 106, except the right of distribution.").

The first sale defense is inapplicable for another, equally fundamental, reason: The Codes are not copies.  "'Copies' are *material objects … in which a work is fixed* …."  17 U.S.C. § 101 (emphasis added).  To be "fixed," a work must be "embodi[ed]" in the material object.  *Id*.  The Codes are numbers and letters printed on package inserts.  Although a piece of paper is a "material object," the "work"

-3-

1   (i.e., the Disney movie) is not "fixed" "in" that object.  *Id.*  The Code is, in the

2   words of Redbox's executives, merely "a key to open up a copy."  Suppl. Ehler

3   Decl. Ex. W, Smith Dep. 31:16–18; *id.* Ex. U, Chamberlain Dep. 77:2–5, 77:19–22.

4   The first-sale cases that Redbox cites are inapposite, Opp. at 6–10, because all of

5   them involved the distribution of copies.[1]  This case does not.

6       Redbox does not even cite the Act's definition of "copies."  Redbox instead

7   argues that the Court should treat the sale of a Code as the equivalent of "Redbox

8   using the code to download the digital copy onto a portable memory device and

9   reselling that device itself."  Opp. at 14.  But Redbox is *not* downloading the digital

10  copies onto physical media and then selling the portable memory devices.  If

11  Redbox were distributing devices, the customers would be acquiring copies.  Here,

12  the Codes may enable end-users *to make copies* but they are not copies themselves.

13  Section 109(a) is "not [] ambiguous.  The statute plainly applies to the lawful

14  owner's 'particular' [copy]."  *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d

15  640, 655 (S.D.N.Y. 2013).

16      Redbox also argues the Court should treat the Code as "a particular copy" of a

17  movie because the Code "authenticates the delivery of a *single* digital copy of the

18  movie."  Opp. at 7 (emphasis added).  That argument is factually baseless.  There is

19  no "particular" digital copy of a movie that is sitting on a server, corresponding to,

20  e.g., the Code "KMPW8WJ7YW6."  Marinelli Decl. Ex. B.  Nor does a Code limit

21  the user to a *single* digital copy.  Depending on the license terms of a specific

22  download service or a particular subscription plan, an end-user is often able to make

23  multiple copies of the underlying content on different devices.  For example, the

24  iTunes terms provide that authorized users may download content to as many as 10

25

26  [1] *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908) (book); *UMG Recordings,*

27  *Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011) (promotional CD); *Softman Prods.*
    *Co. v. Adobe Systems Inc.* 171 F. Supp. 2d 1075, 1080 n.2 (C.D. Cal. 2001) ("sets of

28  individual Adobe products . . . on separate CD's"); *Burke & Van Heusen, Inc. v.*
    *Arrow Drug, Inc.*, 233 F. Supp. 881 (E.D. Pa. 1964) (records).

devices logged in with the same Apple ID; each of those downloads involve the creation of a separate copy.  Suppl. Ehler Decl. Ex. Y at 100.  If a family owns a Combo Pack and shares an iTunes family plan, multiple members of that family may make different downloaded copies.  *Id*. at 101.  A Code cannot represent "a particular copy" when it may be redeemed to make multiple copies, on different devices and even by different end-users.

Finally, Redbox is also wrong that the first-sale defense bars Disney's state-law claims.  Opp. at 10.  *See United States v. Wise*, 550 F.2d 1180, 1187 & n.10 (9th Cir. 1977) (first sale does not apply to a contract claim); *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 174 (D. Mass. 2008) (same); *Pendleton Woolen Mills, Inc. v. Kraff's Men's Wear Co., Inc.*, No. 3:14-CV-628-PK, 2014 WL 7777762, at \*8 (D. Or. Nov. 21, 2014) (defense did not reach state-law trademark, unfair competition, or intentional interference claims).

## B. Redbox's Copyright Misuse Arguments Are Baseless

Redbox, like other copyright pirates, relies on baseless rhetoric claiming price fixing and other "anti-competitive" behavior.  Opp. at 1, 14–17.  Such unsubstantiated allegations provide Redbox no cover.[2]  Disney does not set the prices its retailers charge for downloads.  Suppl. Ehler Decl. Ex. X, Marinelli Dep. 160:25–161:2 ("[T]he retailer decides how they're going to ultimately set a retail price.").  Nor does Disney restrict the unauthorized sale of Codes to harm consumers.  Disney offers Combo Packs so consumers who want the flexibility of a

---

[2] Vague allegations of antitrust violations and the defense of copyright misuse have become standard for parties that contribute to mass copyright infringement.  *See, e.g.*, *Napster*, 239 F.3d at 1026-27 (rejecting copyright misuse defense as ground for denying preliminary injunction); Order Granting Pls.' Mot. to Dismiss, *Disney Enters., Inc. v. VidAngel*, No. 2:16-cv-04109-AB-PLA (C.D. Cal. Aug. 10, 2017), ECF No. 199 (dismissing antitrust counterclaim and striking copyright misuse defense); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 995–98 (C.D. Cal. 2006) (striking copyright misuse defense).

DVD, Blu-ray disc, and Code may benefit if, as is generally true, retailers pass along the wholesale savings Combo Packs provide.  Marinelli Decl. ¶ 9.

The Ninth Circuit construes copyright misuse narrowly and applies it "sparingly."  *Oracle USA*, 2018 WL 315568, at *7 (citation omitted).  The Ninth Circuit has found misuse in just one case, where a copyright holder required its licensee's "promise not to use competitors' products."  *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 521 (9th Cir. 1997).  It is not misuse for a copyright owner to "refus[e] to license a copyrighted work" or to license "only on terms the copyright owner finds acceptable,"[3] *Napster*, 239 F.3d at 1027 (citation omitted), or to use "conditions to control use of copyrighted material," *Oracle USA*, 2018 WL 315568, at *7 (citation omitted).

Moreover, copyright misuse is an affirmative defense and the burden is on Redbox to show the defense applies.  *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (defendant bears burden of showing likely success on defense to oppose motion for preliminary injunction).  Redbox falls far short of meeting its burden.

Redbox complains that Disney is imposing terms on the alleged "downstream" use of its copyrighted works.  Opp. at 14–17.  But, the only facts that Redbox points to are (a) Disney bars the sale of Codes separate from the DVD and Blu-ray disc copies of the underlying copyrighted work in the Combo Packs; and (b) the redemption sites condition the exercise of the right to make downloads on the end-user having possession of the discs in the Combo Pack.  Redbox does not allege that Disney is trying to extend its copyright over the underlying movies to other, non-copyrighted products.  All of the Combo Pack components either contain a

---

[3] This principle extends well beyond the copyright context—it is axiomatic that manufacturers are free to decide with whom they will deal and on what terms. *E.g.*, *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

copy of (the discs) or allow access to (the Code) the same copyrighted work (e.g., *Beauty and the Beast*).  Disney is not "seeking to extend a copyright monopoly to other products or works," but rather to protect the very copyrights in issue.  *Psystar*, 658 F.3d at 1157–58 (rejecting misuse based on first sale arguments involving licensed software); *Napster*, 239 F.3d at 1026.

Redbox's cases, by contrast, all involved allegations of copyright owners trying to extend their copyrights to products other than the copyrighted works. *Omega S.A. v. Cosco Wholesale Corp*., 776 F.3d 692 (9th Cir. 2015) (Wardlaw, J. concurring) (Omega used copyright for a "Globe Design" to improperly control the distribution of watches); *Practice Mgmt.*, 121 F.3d 516 (AMA used license for its code system to restrict licensees' ability to use competing system); *DSC Commc'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597 (5th Cir. 1996) (DSC used its copyright operating system to control unpatented microprocessor cards); *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990) (license restrictions restricted licensees' ability to develop competing products).

## II.   REDBOX FAILS TO COUNTER DISNEY'S SHOWING OF LIKELY SUCCESS

### A.   Redbox Is Bound By And Has Violated The Terms Of Disney's Box-Top Contracts Prohibiting The Sale Of Codes

Box-top contracts bar Redbox from selling Codes.  Mot. at 9–11.  None of Redbox's excuses provides a defense to its breach.

Redbox complains about the font size and packaging used prior to June 2017.[4]  Opp. at 6–8.  Those complaints are irrelevant to Redbox's liability; Redbox

---

[4] Each of Disney's Combo Packs released since June 2017 has the language "Codes are not for sale or transfer" printed on the outside of the Combo Pack.  Suppl. Klaus Decl. at Ex. S at 10, Ex. T at 17, Ex. DD at 77, Ex. JJ at 112; *see also* Suppl. Ehler Decl. Ex. X, Marinelli Dep. 210:9–13 (the same language will appear on all future Combo Packs).  Redbox did not start selling Codes until several months after the change.  Suppl. Ehler Decl. Ex. W, Smith Dep. 6:16–17 ("We started selling codes sometime in Q4 of 2017."); *id.* Ex. U, Chamberlain Dep. 7:20–23 (same).  All 20 titles on Disney's Exhibit A have the following language on the outside of the

1  does not deny that *it* understood full well the contractual limitations when it

2  purchased tens of thousands of Combo Packs.[5]  Nor would any such denial be

3  credible for a corporate entity that has supposedly spent $700,000 and launched a

4  highly publicized campaign to sell Codes.  *See* Declaration of Galen Smith ("Smith

5  Decl.") (Dkt. 31) ¶ 18; Suppl. Ehler Decl. Ex. U, Chamberlain Dep. 9:20–10:15

6  (asserting privilege over whether Redbox's leadership team discussed legality of

7  selling Codes before launching the business), 124:16–125:5 (same with respect to

8  whether they discussed "Codes are not for sale or transfer" language).

9       Redbox knew and understood the terms on the outside of the Combo Packs.

10  When it purchased the Combo Packs, Redbox accepted those terms and the benefits

11  of the transaction.  No more is required for the formation of a box-top contract.

12  *Golden Eagle Ins. v. Foremost Ins.*, 20 Cal. App. 4th 1372, 1387 (1993) ("[A]

13  voluntary acceptance of the benefit of a transaction is equivalent to a consent to all

14  obligations arising from it, so far as the facts are known, or ought to be known, *to*

15  *the person accepting*." (quoting Cal. Civ. Code § 1589) (emphasis added)).

16       Redbox says that *Norcia v. Samsung Telecommunications America, LLC*, 845

17  F.3d 1279 (9th Cir. 2017), holds that the packaging must contain "an express

18  notification to the customer that opening the package constitutes acceptance of the

19  terms and conditions."  Opp. at 10.  That is wrong.  *Norcia* deals with "shrink wrap"

20  licenses, the terms of which are found inside the box or when software is booted up.

21  That is not the case with Redbox.  The box-top contract concerns the terms on the

22

23  _____

     Combo Packs: "This product is authorized for private use only.  It is prohibited for
24  any other use and cannot be resold or rented individually."  Suppl. Klaus Decl. ¶ 4.

25  [5] Redbox's observations about the information included on Disney's web page, *see*
     Supplemental Declaration of Michael Chamberlain ("Suppl. Chamberlain Decl.")
26  (Dkt. 40) ¶ 4 & Ex. D, are similarly irrelevant.  Redbox did not buy Combo Packs
     from Disney's web page, and no Redbox witness testified under oath to doing so.
27  Redbox buys Disney's Combo Packs in retail stores.  *See, e.g.*, Suppl. Ehler Decl.
     Ex. W, Smith Dep. 86:9–12; *id.* Ex. U, Chamberlain Dep. 46:23–24, 47:7–48:18.
28  Redbox then manually disassembles and repackages thousands of Codes, each of
     which bears language prohibiting resale.  *See, e.g.*, Suppl. Klaus Decl. Exs. R–KK.

outside of the Combo Pack. *See Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l Inc.*, 421 F.3d 981, 987–88 (9th Cir. 2005) (consumers entered into enforceable contract by buying and opening cartridge packages and were bound by terms printed on outside packaging). Redbox's argument that the box-top terms are cryptic or hard to read is disingenuous given that Redbox buys thousands of Combo Packs and has full knowledge of the contract terms. Suppl. Ehler Decl. Ex. U, Chamberlain Dep. 21:10 (█████████████████████████), 86:15–87:3, 127:16–19 (Redbox reviews other contract terms like expiration dates).

In all events, Redbox knows what the language means now, and notwithstanding that, Redbox intends to continue buying Combo Packs and selling Codes indefinitely, unless the Court enjoins it. *Id.* 20:7–9; *see also id.* Ex. W, Smith Dep. 145:3–23.

### B. Redbox Is Contributorily Liable For Its Customers' Unauthorized Copying

Redbox is liable for contributory copyright infringement because (1) its customers infringe when they use Codes without authorization to download copies of Disney's movies; (2) Redbox knows its customers are infringing because Redbox knows (or willfully blinds itself to) the online terms of use that condition the right to copy on simultaneous ownership of the accompanying discs; and (3) Redbox materially contributes to that infringement by selling Codes and encouraging customers to use them to download movies. Mot. at 11–16.

Redbox does not contest either its knowledge of or contribution to the infringing activity.[6] Redbox instead argues that its customers are not infringing Disney's copyrights. Opp. at 13–14. Its arguments are meritless.

---

[6] The Combo Packs that Redbox buys state clearly that "[t]erms and [c]onditions apply," *see, e.g.*, Suppl. Klaus Decl. Ex. S at 10, and the Code insert likewise directs the purchaser to the governing terms and conditions on the redemption and download websites. *See, e.g.*, *id.* at 12. Redbox does not deny it reviewed the website terms before selling Disney's Codes.

1    First, Redbox repeats its first-sale arguments, which are inapposite for reasons

2  discussed, including that Redbox's customers infringe Disney's reproduction right,

3  *Napster*, 239 F.3d at 1014, to which the first-sale defense does not apply.

4    Second, Redbox argues its customers are in fact free to make downloads

5  using Codes sold by Redbox.  Opp. at 13.  But Redbox's customers' downloads are

6  not authorized because the licenses they must enter into to download the movies are

7  conditioned on the end-user owning the discs that were sold along with the Code in

8  the Combo Pack.  Redbox asserts that "there is no license and even Plaintiffs do not

9  claim that one was created."  Opp. at 13.  But this assertion erroneously presumes

10  that Disney is claiming the end-user downloads are somehow controlled by a license

11  between Disney *and Redbox*.  Disney is not claiming that the packaging and online

12  terms of service create a license between Disney *and Redbox* controlling the

13  download of a digital copy.  Disney's claim is that the relevant licenses for

14  Redbox's contributory infringement liability are the licenses entered into by the end-

15  user redeeming the Code to make a downloaded copy of the movie.

16    Those licenses are found in the online terms of service to which the Code

17  redeemer must agree in order to make the download.  Those licenses are conditioned

18  on the end-user owning the discs that were sold along with the Code in the Combo

19  Pack.  The paper Code inserts direct end-users to two sites for redeeming the Codes,

20  RedeemDigitalMovie.com or MoviesAnywhere.com (formerly

21  DisneyMoviesAnywhere.com).  Supplemental Declaration of Kelly M. Klaus (Dkt.

22  28) ("Suppl. Klaus Decl.") Exs. R–KK.  Redbox's own FAQ page on its website

23  directs its customers to "Look for the redemption URL on the paper insert you

24  received from Redbox."  Klaus Decl. Ex. M at 77.

25    For RedeemDigitalMovie.com, the website condition requires that the user

26  entering the Code must be "the owner of the physical product that accompanied the

27  digital code at the time of purchase."  *Id*. Ex. A at 6.  The end-user must further

28  agree to the terms of service for either Movies Anywhere (discussed below) or the

-10-

1  user's chosen service for downloading movies, such as iTunes. Those services, in

2  turn, require agreement to licenses that incorporate the terms and conditions for

3  third-party content (like Disney's movies). Suppl. Ehler Decl. Ex. Y at 109.

4      Redbox claims that RedeemDigitalMovie.com's reference to "physical

5  product" is ambiguous and could mean the paper insert on which the Code is

6  printed. Opp. at 12. That interpretation is implausible. The "physical product"

7  refers to the discs in the Combo Pack; otherwise the remainder of the sentence from

8  RedeemDigitalMovie.com—"*that accompanied the digital code* at the time of

9  purchase"—would make no sense. Klaus Decl. Ex. A at 6 (emphasis added).[7]

10      The Movies Anywhere site contains similar restrictions.[8] *Id.* Ex. B at 15.

11  Because that site enables users both to redeem Codes and store and access

12  downloaded content, the site has its own terms of service governing use of such

13  content. *Id.*

14

---

15  [7] Redbox cites a line from an FAQ on another website that says "Note—Redeem

16  Digital Movie titles do NOT require a disc for Digital Movie redemption."

   Geibelson Decl. Ex. E. That line refers to the fact that someone using the

17  RedeemDigitalMovie.com site does not have to place the physical discs into a disc-

   drive to download the movie. *See* Curtis Decl. ¶¶ 3–6. Redbox also is wrong that

18  Ms. Marinelli testified that the piece of paper is the "physical product." Ms.

   Marinelli said only that the ███████████████████████████

19  ███████████████. Suppl. Ehler Decl. Ex. X, Marinelli Dep.

20  62:23–63:5.

21  [8] Redbox argues that Movies Anywhere is not a plaintiff and "nothing in the Movies

   Anywhere terms of service identify Plaintiffs as third-party beneficiaries or express

22  any understanding that they are intended to benefit from its terms." Opp. at 12.

   Redbox did not read the terms. Disney is both a licensor to Movies Anywhere and a

23  "Participating Studio[]." Klaus Decl. Ex. B at 17. Section 2 of those Terms states

   that violations of the Movies Anywhere restrictions "is a violation of the rights of

24  [Movies Anywhere's] licensors." *id.* at 13; and that. "[w]hile accessing or using a

   Participating Studio's Content," users are "subject to that Participating Studio's

25  rules and restrictions." *id.* at 17. These provisions show the intent that Disney

   benefit from the terms of use and establish Disney as a third-party beneficiary.

26  *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir.

27  1999) ("The intended beneficiary need not be specifically or individually identified

   in the contract, but must fall within a class clearly intended by the parties to benefit

28  from the contract.").

-11-

Redbox cannot dispute that the terms from RedeemDigitalMovie.com and Movies Anywhere create a license between Disney and the end-user. *See Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010) (setting forth the three factors that show license). The terms (1) grant the user a license, not ownership of the copy[9]; (2) restrict the user's ability to access, download, and transfer copies of the movies[10]; and (3) impose other notable use restrictions.[11] *Id.*

Redbox also argues that its customers do not exceed the licenses because the copy they make is one that Disney "expect[ed] … would be delivered by electronic download." Opp. at 13. But the governing terms of service make clear that it is not expected (or permitted) that someone who bought the Code separate from the Combo Pack will be making a copy. *See* Klaus Decl. Exs. A, B; *see also* Suppl. Ehler Decl. Ex. X, Marinelli Dep. 218:8–18 (explaining that customers are "honest and [if you] give them a legitimate way to buy content and consume content, that's what they're going to do."). Redbox's customers act outside the scope of their licenses when they download using a Redbox-sold Code.

---

[9] "You understand and agree that the Content you receive through the Movies Anywhere Service is licensed to you for your personal, noncommercial use . . . . Movies Anywhere does not transfer any ownership, title, right or interest to or in the Content to you." Klaus Decl. Ex. B at 20. "All digital movie codes are owned by Buena Vista Home Entertainment, Inc. and you may use such digital movie codes only as specifically authorized under these terms and conditions." *Id.* Ex. A at 7.

[10] "<u>License</u>. . . . Movies Anywhere grants you a limited . . . non-transferable, non-assignable, . . . non-sublicensable right to . . . stream or download . . . the movies." Klaus Decl. Ex. B at 11–12. For RedeemDigitalMovie.com, "The sale, distribution, purchase or transfer of digital movie codes outside of the methods set forth in these terms and conditions is unauthorized." *Id.* Ex. A at 7.

[11] "<u>Restrictions on Your Use of the Content</u>." Klaus Decl. Ex. B at 12. The Movies Anywhere terms likewise prohibits customers from accessing and downloading a copyrighted work by redeeming a Code that is not "from a Digital Copy enabled and Movies Anywhere-eligible physical product that is owned by you." *Id.* at 15. RedeemDigitalMovie.com "prohibit[s]" the "redemption of a digital code sold or transferred separate from the original physical product." *Id.* Ex. A at 6.

-12-

C.    **Redbox Misconstrues Disney's State-Law False Advertising Claims And Misunderstands The Applicable Law**

1.    **The Deceptive Advertising Claims Are Not Preempted Or Subject To A "Safe Harbor"**

Redbox tries to recast Disney's UCL and FAL causes of action as mere claims that "Redbox violates the Copyright Act by reselling digital copies of movies it purchases at retail." Opp. at 17. But Disney's UCL and FAL claims address Redbox's deceptive packaging and marketing practices. Specifically, Redbox fails to inform consumers that the Codes were originally sold as part of Combo Packs and that terms and conditions govern the Codes' use. Redbox also breaks apart the Code inserts, removing portions that reference those terms and conditions and offer other helpful user guidance. *See* Section III.A.2, *infra*. By failing to disclose this relevant information, Redbox deceives its customers and engages in actionable false advertising under the UCL and FAL. *See Ariz. Cartridge Remanufacturers Ass'n*, 421 F.3d at 985 (UCL and FAL encompass deception through "failure to disclose other relevant information" (quoting *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332–33 (1998))).

Redbox argues that the Copyright Act, 17 U.S.C. § 301(a), preempts these claims. But § 301(a) preempts only those claims that are "equivalent to any of the exclusive rights within the general scope of copyright." *Valente-Kritzer Video v. Pinckney*, 881 F.2d 772, 776 (9th Cir. 1989) (citation omitted). It does not preempt state-law claims that have an "'extra element' which changes the nature of the action." *Id*. (citation omitted). The UCL and FAL claims each have the "extra element" of a misleading or false statement. *Variant Displays, Inc. v. Absolute Exhibits, Inc.*, SACV 15-01685-CJC (JCGx), 2016 WL 7486282, at *3 (C.D. Cal. May 31, 2016) (UCL claim premised on misrepresentations stated an "extra element"); *Nicole, Inc. v. B.L.K. Int'l, Inc.*, No. CV 15-01892-RGK (Ex), 2015 WL 12826459, at *4 (C.D. Cal. June 25, 2015) (UCL claim contains element of "whether members of the public are likely to be deceived" and is not preempted).

-13-

Redbox's reliance on California's statutory "safe harbor" doctrine fails for similar reasons.  Opp. at 17–18.  The Copyright Act's preemption clause does not immunize Redbox's deceptive advertising practices and neither does the first-sale defense.  Redbox's deceptive advertising practices are thus not "permitted by law," *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999), and the safe harbor offers no protection from liability.

### 2. Disney Has Standing To Seek Relief Under The UCL And FAL Because Redbox Is Harming Disney's Goodwill

Redbox argues that Disney lacks standing to assert UCL and FAL claims because it has not presented "evidence of even a single digital code being purchased from Redbox instead of one of [its] licensees."  Opp. at 19.  But Redbox's conduct almost certainly has caused Disney to lose sales, and that conduct is harming Disney's goodwill with its licensees.  *See* Section III, *infra*.  These harms satisfy the economic injury requirement for UCL and FAL standing.  *In re Qualcomm Litig.*, No. 17-CV-00108-GPC-MDD, 2017 WL 5985598, at *5 (S.D. Cal. Nov. 8, 2017) (finding standing where plaintiff alleged "lost customers, goodwill, and the loss of business relationships"); *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 948 & n.1 (S.D. Cal. 2016) (finding standing where plaintiff alleged lost sales, market share, and good will).

### 3. The UCL And FAL Claims Do Not Require Extraterritorial Application Because There Is A Sufficient Nexus Between Redbox's Misrepresentations And California

Redbox's argument that Disney's UCL and FAL claims assert extraterritorial control, Opp. at 21, reflects a fundamental misunderstanding of the extraterritoriality doctrine.

Extraterritoriality is not an issue if there is a "nexus between California and the misrepresentations which form the basis of [the plaintiff's] claims."  *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014).  Here, there plainly is such a nexus.  Each plaintiff is either a California corporation or entity with its

-14-

principal place of business in California.  *See Ulti-Mate Connectors, Inc. v. Am.*
*Gen. Life Ins.*, No. SACV 14-1051-JLS (JPRx), 2015 WL 12734007, at *9 (C.D.
Cal. Mar. 27, 2015) ("Plaintiffs are not attempting to apply California's UCL
extraterritorially because all Plaintiffs are either a California corporation with
principle place of business in California or are individual residents of California.").
Further, Redbox maintains multiple warehouses in California to service several
Redbox-identified "markets" here; retains California-based field staff that purchase
Combo Packs in California and disassemble the Combo Packs and repackage the
Codes in warehouses here for in-state distribution; operates numerous kiosks
throughout California through which it sells the deceptively packaged Codes; and
makes Codes available for sale online to consumers located in California through its
website, which includes misleading marketing messages.  Suppl. Ehler Decl. Ex. U,
Chamberlain Dep. 73:12–75:15.

### D.   Disney Will Succeed On Its Tortious Interference Claim Because Redbox Interferes With Contracts That Disney Already Has With Its Customers

Redbox argues it cannot interfere with contracts between Disney and its
customers because when Redbox sells the Code, there is no contract between the
customer and Disney.  Opp. at 21.  Redbox ignores the fact that any consumer who
had used RedeemDigitalMovie.com or the Movies Anywhere service before
purchasing a Code from Redbox had already agreed to the terms of service to access
those sites.  Those consumers thereby entered into enforceable contracts.  *See MDY*
*Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 955 (9th Cir. 2010) (holding
"operative EULA and ToU" (terms of service) were "a valid contractual
relationship" between copyright owner and its customers).  Those terms bind the
customer when they first use RedeemDigitalMovie.com or Movies Anywhere and
govern the customers' prospective use.  *See* Suppl. Ehler Decl. Ex. Z at 112-13
(RedeemDigitalMovie.com:  "Contract between You and Us. . . . You must read and
agree to these terms before using the Disney Services."); Klaus Decl. Ex. B at 9

-15-

(Movies Anywhere: "You agree to these Movies Anywhere Terms of Use by clicking the checkbox, 'I Agree' . . . or by your use of any aspect of the Movies Anywhere Service."). Disney is a party to or an intended third-party beneficiary of those agreements. See n.8, *supra*. Hence, some Redbox customers (especially repeat Code purchasers) will have existing contractual arrangements with Disney when they buy Codes. Redbox admits that it does not know what percentage of its customers already had RedeemDigitalMovie.com or Movies Anywhere accounts before purchasing a Code from Redbox, Suppl. Ehler Decl. Ex. W, Smith Dep. 113:12–25, 124:24–125:11; *id.* Ex. U, Chamberlain Dep. 174:9–20, and it knows that such services are subject to terms of use.

### E.   Disney Is Likely To Succeed On Its UCL "Unlawful" Claim Because Redbox Violates State Law

Redbox's cursory response to Disney's UCL "unlawful" conduct claim incorporates its meritless challenges to Disney's other state-law claims. Opp. at 22–23. Redbox's false advertising and tortious interference are "unlawful" business practices under the UCL. *See* Mot. at 18–19.

### III.   REDBOX IGNORES OR DOWNPLAYS THE CLEAR EVIDENCE THAT ITS ILLEGAL CONDUCT IS IRREPARABLY HARMING DISNEY'S RELATIONSHIPS WITH LICENSEES AND CUSTOMERS

#### A.   The Harm To Disney's Relationships With Licensees And Customers Is Imminent And Real, Not Speculative

##### 1.   Redbox's Illegal Conduct Threatens Disney's Goodwill And Relationships With Its Licensees

Redbox concedes that "loss of goodwill" or "negotiating leverage" establishes irreparable harm, but claims Disney has "no evidence" of licensee complaints or any effect on its "customer base." Opp. at 23–24. Redbox's contention ignores or mischaracterizes the record.

The same day that *Deadline Hollywood* reported on Redbox selling Codes, two of Disney's licensees, ███████████████, forwarded the article and asked Disney how it would respond. Geibelson Decl. Exs. B, C. One of those emails

-16-

1  explicitly asked █████████████████████████████████. *Id.* Ex. B.  Both

2  emails prompted follow-up telephone conversations.  Suppl. Ehler Decl. Ex. X,

3  Marinelli Dep. 34:12–23, 35:16–36:2.  A third licensee, ███████, also expressed

4  concern regarding Redbox's actions by telephone, both to Ms. Marinelli directly and

5  to another member of her team.  *Id.* at 25:16–27:16.

6        Redbox mischaracterizes these emails as merely posing "questions," and it

7  ignores the phone conversations altogether.  Opp. at 24.  Ms. Marinelli testified that

8  she was ████████████████████████████and was certain that more

9  licensees would reach out if Redbox's conduct continued unabated.  Suppl. Ehler

10 Decl. Ex. X, Marinelli Dep. 163:5–19, 164:8–19.  Disney depends on the goodwill it

11 has with licensees to promote the sale of Disney's products.  As Ms. Marinelli

12 explained, if iTunes and other licensees are "concerned with us because Redbox is

13 undercutting them in price in the marketplace, they're not incent[iviz]ed to go and

14 promote [Disney] movie[s]."  *Id*. 162:5–9.  This is exactly the type of harm to

15 licensee goodwill that courts have repeatedly said justifies injunctive relief.  *See*

16 *Disney Enters., Inc. v. VidAngel Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (affirming

17 preliminary injunction and rejecting argument that harm to licensee goodwill based

18 on declaration from studio executive was "vague and speculative"); *Warner Bros.*

19 *Entm't v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011) (infringing

20 service caused irreparable harm to "Plaintiffs' relationships, including the goodwill

21 developed with their licensees").

22        Redbox also claims that Ms. Marinelli admitted that negotiations "have not

23 been affected by Redbox's behavior."  Opp. at 24.  In fact, Ms. Marinelli testified

24 that ███████████████████████████████████████████████████████

25 █████████████████████████████████, and that █████████████████████

26 ████████████████████████████████████████████████████████.  Suppl.

27 Ehler Decl. Ex. X, Marinelli Dep. 42:12–20, 47:9–15.  As for the other licensees,

28 Ms. Marinelli testified that she believed they had not complained since the filing of

-17-

1  this lawsuit because Disney is "tak[ing] action against Redbox." *Id*. 171:13–22,

2  172:23–173:5.  But Ms. Marinelli also testified that she believed Redbox's conduct

3  would make it "[m]ore difficult" to negotiate with those licensees in the future. *Id.*

4  172:9–12.  And if Ms. Marinelli's testimony—based on 32 years of experience with

5  Disney and in the business—left any doubt, one of the licensee emails explicitly

6  asks if Disney ███████████████████████████████████████████████

7  ████████████████████.  *See* Geibelson Decl. Ex. B.  Courts grant preliminary

8  injunctive relief to *prevent* irreparable harm, which Disney faces imminently if

9  Redbox is permitted to continue violating Disney's rights.  *See VidAngel*, 869 F.3d

10  at 865 (Disney need only establish that "irreparable injury is *likely* in the absence of

11  an injunction." (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22

12  (2008)) (emphasis in original)).

13  **2.    Redbox Ignores Record Evidence Of Consumer Confusion**

14  Redbox's claim that there is no evidence Disney's "customer base has been

15  affected by Redbox's digital [Code] sales," Opp. at 23–24, again ignores the record

16  and the fact that, without an injunction, Disney will suffer even more harm to these

17  relationships.

18  Redbox is not placing the entire Code insert, much less the entire Combo

19  Pack packaging, in the Redbox "jewel case."  Instead, Redbox separates the portion

20  bearing the alphanumeric Code from the rest of the insert—sometimes even tearing

21  the paper insert in half and delivering only that part of the insert that has the

22  alphanumeric Code printed on it.  *See* Suppl. Ehler Decl. Ex. U, Chamberlain Dep.

23  98:11–15, 103:16–22, 113:23–114:6; *compare id.* ¶ 3 & Ex. V (images of Redbox

24  inserts for *Frozen*, *Guardians of the Galaxy Vol. 2*, and *Moana*) and Klaus Decl. Ex.

25  C (same for *Beauty and the Beast*), *with* Suppl. Klaus Decl. Exs. S at 11–14, V at

26  30–32, AA at 60–63, JJ at 113–16 (images of the original Disney inserts for *Beauty*

27  *and the Beast*, *Frozen*, *Guardians of the Galaxy Vol. 2*, and *Moana*).  As a result of

28  Redbox's repackaging, important information intended for consumers may very well

-18-

be ending up in Redbox's trash can—rather than in consumers' hands.[12]  Suppl. Ehler Decl. Ex. U, Chamberlain Dep. 114:7–12.

Redbox's witnesses say they are unaware whether Redbox has received complaints from its Code purchasers.  Declaration of Michael Chamberlain (Dkt. 32) ¶ 10; Suppl. Ehler Decl. Ex. U, Chamberlain Dep. 152:21–154:18.  That is exactly the point.  The customers who buy Codes and have issues contact *Disney*, not Redbox, when their experience of using the Codes does not match their expectations, Marinelli Decl. ¶ 17, because Redbox has taken it upon itself to omit information that Disney provided with the Combo Pack.  Disney, however, has produced evidence demonstrating consumer confusion and corresponding harm to Disney's relationship with those consumers.[13]

### 3. Redbox Cherry Picks Evidence In Arguing That Its Sale Of Codes Is Not Hurting Disney's Business

Redbox makes the specious argument that its sales of Codes at prices substantially below those charged by licensed digital services will not cause Disney harm.  Opp. at 4.  As support, Redbox provides incomplete pricing information for exactly one title out of the 20 identified in the complaint:  *Cars 3*.  Redbox claims that, since November 17, 2017, it has sold Codes for *Cars 3* for $14.99, which is the same price that Amazon and Vudu currently charge for a digital download of that

---

[12] Redbox concedes as much through eleventh-hour "modifications" to its webpage and kiosks to begin disclosing Code expiration dates for the first time.  Suppl. Chamberlain Decl. ¶¶ 2–4.  These changes only confirm Redbox's failure to disclose to its customers that the Codes are subject to certain terms and conditions, which has caused and will continue to cause consumer confusion.  Marinelli Decl. ¶ 17.  Redbox's late change will not affect the ███████ sales Redbox has already made to customers or ameliorate Redbox's omission of other information regarding Code use.

[13] Customers have complained that they cannot tell whether the Codes Redbox sold them may be redeemed for digital downloads in standard definition ("SD") or high definition ("HD") format.  *See* Suppl. Ehler Decl. Ex. AA at 123-24, 132-33. Redbox's conduct also means that customers are not getting important information on the packaging regarding the restrictions or limitations that the downloading service may impose on their license to download the movie.  This, too, has caused confusion.  *See id.* at 125-31.

-19-

title in SD format.  *Id*.; Smith Decl. ¶ 15.  Redbox insists that, because the licensed services started selling those downloads two weeks before customers "were aware" Redbox was selling Codes for the same title, and Redbox sold 200 Codes at the $14.99 price point, this proves that Redbox's sales will not displace the licensed services' sale of downloads.  Opp. at 4.  Redbox's reliance on its recent pricing of the Code for *Cars 3* is misleading.  End-users who purchased a Code from Redbox could use it to obtain *Cars 3* in HD format; Amazon and Vudu sell the HD digital download for $19.99.

Redbox cherry picked the sale of 200 Codes for *Cars 3* as their example. There are 19 other titles for which Redbox has sold Codes and Redbox has sold approximately ███████████.  Suppl. Ehler. Decl. Ex. U, Chamberlain Dep. 21:10.  Publicly available documents show that Redbox typically offers a 60%-80% discount from the iTunes price, and *Cars 3* is the only title that Redbox prices over $10.  Klaus Ex. H at 45 (compiling prices as of Dec. 7, 2017).  Redbox's own witness explained that undercutting other retailer's prices drives the demand for Redbox's service.  Smith Decl. ¶¶ 5–6.  As Ms. Marinelli explained, customers "may forego buying a digital download of that movie through a Disney licensee, negatively impacting their sales and revenue."  Marinelli Decl. ¶ 12.  In short, Redbox is displacing sales of digital downloads by Disney's licensees.  That is the entire point of Redbox's offering and it is harming those licensees and Disney.

## B.  Redbox's Claim That Its Illegal Conduct "Benefits" Disney Is Wrong And Disingenuous At Best

Redbox cynically tries to minimize the harms by claiming that Redbox's illegal sales of Codes actually benefits Disney.  Opp. at 3, 24; Smith Decl. ¶¶ 6, 10–13.  For example, Redbox claims that its purchases of Combo Packs benefit Disney because they supposedly "fulfill[] . . . revenue expectations . . . from those sales."  Opp. at 24; Smith Decl. ¶ 9.  Redbox does not account for the negative impact on sales of digital downloads for those same titles.  Suppl. Ehler Decl. Ex. X, Marinelli

1    Dep. 178:3–5 ("Disney is not earning any revenue from the sale of the digital code

2    so that undermines the revenue that Disney earns."), 184:13–17 ("[I]t is a lost sale

3    opportunity because that consumer now has a digital download of a movie that we

4    did not benefit nor did our licensees and our partners benefit from."); Suppl.

5    Marinelli Decl.¶ 3.  Nor does Redbox account for the potential lost sales of Combo

6    Packs.  Marinelli Decl. ¶ 16; Suppl. Marinelli Decl. ¶ 3.  Regardless, "[a]ny positive

7    impact of defendant's activities on plaintiffs" is not relevant.  *See VidAngel*, 869

8    F.3d at 861 (rejecting purported benefits to copyright owner in discussing impact on

9    the market factor of fair use analysis (quoting *Napster*, 239 F.3d at 1017)).  To the

10   extent Redbox makes large-volume purchases, Redbox's purchase of Combo Packs

11   may actually lead to the retailer running out of stock, which frustrates the ability of

12   Disney and its retailers to fulfill legitimate customer demand.  Suppl. Marinelli

13   Decl.¶ 3.  Further, Mr. Smith admitted at his deposition that he knows nothing about

14   how Disney and its retailers work together to allocate volume to retail stores.  Suppl.

15   Ehler Decl. Ex. W, Smith Dep. 109:9–12.

16       Redbox also argues that its sale of Codes furthers Disney's "goal of

17   introducing viewers to digital movies and migrating them away from physical

18   discs."  Opp. at 3.  Redbox overlooks the fact that it discards promotional and

19   informational material in Combo Packs that Disney uses to connect with customers,

20   many of whom may already be download customers.  Suppl. Marinelli Decl. ¶ 4.

21   Mr. Smith also admitted that he knows nothing about how many consumers who

22   purchase Redbox Codes are first-time digital movie watchers or users of Disney's

23   redemption sites, and he was not aware of any effort by Redbox to find out that

24   information.  Suppl. Ehler Decl. Ex. W, Smith Dep. 113:12–114:5.

25       Redbox also claims that it provides Disney with customer information, the

26   "value" of which "certainly exceeds the cost of a single movie" because it ultimately

27   "cut[s] out the revenue shares paid to other vendors who currently provide Disney's

28   content to customers, such as Amazon, iTunes, and Vudu."  Smith Decl. ¶¶ 10, 11.

-21-

As Ms. Marinelli testified, driving consumers away from Disney's licensees does not help those licensees or Disney because Disney ultimately benefits from its licensees' relationships with their customers.  Suppl. Marinelli Decl. ¶ 5.  And, Redbox's unauthorized sale of Codes deprives both Disney and its licensees of revenue from the licensed downloads.  *Id*.  Mr. Smith admitted that he could not even identify what "valuable" consumer information he claims redounds to Disney as a result of Redbox's unauthorized sales—let alone confirm whether Disney collects any information from services like Movies Anywhere or whether it would consider such data "valuable."  *See* Suppl. Ehler Decl. Ex. W, Smith Dep. 120:3– 122:7.

Redbox's unsupported argument that its sale of Codes for below market prices "discourages piracy" (which typically involves no payments) ignores that Redbox, like other pirates, is exploiting Disney's rights without authorization.

## C.   Contrary To Redbox's Claim, The Harms To Disney Are Neither Easily Quantified Nor Remedied With Monetary Damages

Redbox claims that Disney's "indubitably meticulous" record of sales and licensing fees can be used to total up the harm to Disney, by which Redbox means only lost sales.  Opp. at 24.

Even if lost sales to Combo Packs and digital downloads could be quantified, and they cannot be, those lost sales are not the only harm.  Redbox is also harming Disney's goodwill and relationships with licensees and customers.  The cases are clear that these latter harms cannot be easily quantified.  *See VidAngel*, 869 F.3d at 866 (rejecting argument "that damages could be calculated based on licensing fees" because "loss of goodwill, negotiating leverage, and non-monetary terms in the Studios' licenses cannot readily be remedied with damages." (citing *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."))).

-22-

Moreover, Redbox's supposition that lost sales are easy to quantify is contrary to the record. *See* Marinelli Decl. ¶¶ 15, 16 (explaining lost sales cannot be easily quantified). Ms. Marinelli testified that it is "very, very hard to quantify [lost sales] because you don't know what lever got the consumer to buy. . . . Was it price? Was it marketing? Was it placement? Was it the competition?" Suppl. Ehler Decl. Ex. X, Marinelli Dep. 179:6–19; *see also id*. 186:10–19.

## IV.    REDBOX'S CLAIMED HARDSHIP IS LEGALLY IRRELEVANT

Redbox claims the balance of hardships "sharply" favors it because it claims to have invested $700,000 in selling Disney's Codes. Opp. at 25. Redbox does not say how much, if any, of that amount would be lost if it is temporarily enjoined but permitted to operate later—only that that is what it claims to have spent. Regardless, Redbox took a gamble by deciding to violate Disney's rights in clear violation of the prohibition against selling Codes. It is a "long-settled principle that harm caused by illegal conduct does not merit significant equitable protection." *VidAngel*, 869 F.3d at 867; *see also Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("lost profits from an activity which has been shown likely to be infringing ... 'merits little equitable consideration'" (citations omitted)).

Redbox is no startup and any financial harm as a result of this injunction will not imperil Redbox's financial health. Redbox's parent corporation, Outerwall, was acquired by a hedge fund in 2016 for $1.6 billion.[14]   Redbox had ███████████ ████████████████████████████████████████████—a "billion dollar plus business." Suppl. Ehler Decl. Ex. W, Smith Dep. 158:13–17, 68:14–15. Until Redbox launched its sale of Codes in late 2017, the Codes were sitting in a warehouse in empty Combo Packs, unused for years. *Id.* Ex. U, Chamberlain Dep. 11:24–13:14, 16:7–21. Courts have granted injunctions when the stakes are much

---

[14] Lauren Gensler, *Redbox Parent To Be Taken Private for $1.6 Billion*, Forbes (Jul. 25, 2016, 9:14 AM) https://www.forbes.com/sites/laurengensler/2016/07/25/redbox-coinstar-outerwall-acquisition-apollo-1-6-billion/#40938fb46c45.

1  higher for the defendant, including when a startup is threatened with going out of

2  business.  *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009)

3  (where small start-up defendant could not "claim any *legitimate* hardships as a result

4  of being enjoined from committing unlawful activities, and Apple would suffer

5  irreparable and immeasurable harms if an injunction were not issued, this factor

6  weighs strongly in favor of Apple's motion") *aff'd*, 658 F.3d at 1160–61.

7       Redbox's claim that an injunction will "delay" its alleged "entry into the

8  market for selling digital downloads," Opp. at 25, is contradicted by its own conduct

9  and testimony.  Redbox is not selling digital downloads of Disney movies; it is

10 selling Codes. ████████████████████████████████████████████

11 ████████████████████████████████████████████████.

12 Smith Decl. ¶ 4; Suppl. Ehler Decl. Ex. W, Smith Dep. 89:1–6.  Redbox's CEO

13 admits that selling Disney's Codes does not add any content to Redbox's download

14 library, Suppl. Ehler Decl. Ex. W, Smith Dep. 90:1–4; that Redbox plans to continue

15 offering Redbox On Demand regardless of what happens in this lawsuit, *id.* 159:5–

16 9; and that he believes Redbox On Demand can be successful without Disney

17 content ███████████████████████████████████, *id.*

18 78:17–21, 94:9–11.

19 **V.     REDBOX GETS THE PUBLIC INTEREST BACKWARDS**

20      Redbox claims the public would prefer to pay less for Codes from Redbox

21 than the prices charged by authorized licensees.  Opp. at 25.  By that logic, an

22 injunction restraining copyright infringement or contract breaches that cause

23 irreparable harm would never be in the public interest, because the infringer/violator

24 could always price its unlawful offering below licensed offerings.  The law is to the

25 contrary.  *See VidAngel*, 869 F.3d at 867 ("'[T]he public has a compelling interest in

26 protecting copyright owners' marketable rights to their work and the economic

27 incentive to continue creating television programming' and motion pictures."

28 (citations omitted)); *see generally* Mot. at 23–24.

-24-

1    Redbox mischaracterizes Ms. Marinelli's testimony as "admit[ting] that the

2    goal of this lawsuit is to is to *increase*" prices for digital downloads.  Opp. at 25.

3    What Ms. Marinelli actually said was:  "If consumers come to expect that they can

4    buy unauthorized digital downloads for below market prices, this could have a

5    permanent and irreparable negative impact on consumers' expectations and

6    relationships with both Disney and its authorized licensees.  Consumers will come

7    to believe that below market pricing for a digital copy of a movie from an

8    unauthorized service is legitimate, adversely affecting consumers' perception of

9    authorized services."  Marinelli Decl. ¶ 19.

10   Allowing Redbox to continue flouting the law is not in the public interest.

### CONCLUSION

12   The Court should grant Disney's motion for a preliminary injunction.

13   DATED:  January 23, 2018          MUNGER, TOLLES & OLSON LLP

16                                     By:  ___*/s/ Kelly M. Klaus*_____

17                                          KELLY M. KLAUS
                                            Attorneys for Plaintiffs

-25-