1

2

3                                                               O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  DISNEY ENTERPRISES, INC.;      )  Case No. CV 17-08655 DDP (AGRx)
    BUENA VISTA HOME               )
12  ENTERTAINMENT, INC.;           )
    LUCASFILM LTD., LLC, MVL       )
13  FILM FINANCE LLC,              )  **ORDER DENYING PLAINTIFFS' MOTION**
                                   )  **FOR PRELIMINARY INJUNCTION**
14              Plaintiff,         )
                                   )
15       v.                        )
                                   )
16  REDBOX AUTOMATED RETAIL,       )  [Dkt. 13]
    LLC,                           )
17                                 )
                Defendants.        )
18                                 )
    _____    )
19

20       Presently before the court is Plaintiffs Disney Enterprises,

21  Inc., Buena Vista Home Entertainment, Inc., Lucasfilm Ltd., LLC,

22  and MVL Film Finance LLC (collectively, "Disney")'s Motion for

23  Preliminary Injunction.  Having considered the submissions of the

24  parties, the court denies the motion and adopts the following

25  Order.

26  **I.   Background**

27       Disney owns the copyrights to several well-known movies,

28  including *Beauty and the Beast*, *Frozen*, *Star Wars: Episode VII -*

*The Force Awakens*, *Rogue One: A Star Wars Story*, and *Guardians of the Galaxy Vol. 2*.  (Declaration of Rosa Leda Ehler ¶¶ 3, 6, 17-18, 20; Exs. B, E, P, Q, S.)  Disney distributes its films in multiple formats through a variety of channels, including DVD and Blu-ray disc sales, on-demand streaming services such as iTunes and Google Play, and subscription streaming services such as Netflix and Hulu.[1]  (Declaration of Janice Marinelli ¶ 7.)  Among Disney's offerings are "Combo Packs."  (Marinelli Decl., ¶ 8, Ex. A.)  Combo Pack boxes feature large-type text reading, "Blu-Ray + DVD + Digital HD," and include a Blu-ray disc, a digital versatile disc ("DVD"), and a piece of paper containing an alphanumeric code. (Marinelli Decl., Ex. A.)  The alphanumeric code can be inputted or redeemed at RedeemDigitalMovies.com or DisneyMoviesAnywhere.com to allow a user to "instantly stream and download with digital HD." (Id.)  The exteriors of the Combo Pack boxes state, in somewhat smaller print near the bottom third of the box, that "Codes are not for sale or transfer."  (Id.)  Very fine print at the bottom of the boxes indicates, with respect to "Digital HD," that "Terms and Conditions apply."[2]  (Id.)

---

[1] Disney does not sell standalone digital downloads directly to consumers, but does make standalone downloads available through Disney licensees.  (Marinelli Decl., ¶ 10.)

[2] Although Disney describes its *Beauty and the Beast* (2017) packaging as a representative sample of the twenty Combo Packs identified in the Complaint, that does not appear to be the case. (Marinelli Decl., Ex. 10.)  For example, the "Codes are not for sale or transfer" language appears only on Combo Packs released after June 2017.  (Supplemental Declaration of Kelly Klaus ¶ 3.) Similarly, the "Blu-Ray + DVD + Digital HD" language only appears on a small number of Combo Packs, while the packaging of other works named in the Complaint contain different descriptions, such as "Digital Copy."  (Supplemental Klaus Decl., Ex. KK.) Nevertheless, for purposes of determining whether any injunction
(continued...)

1    The download code insert within the Combo Pack box instructs
2  consumers to (1) visit RedeemDigitalMovie.com or Disney Movies
3  Anywhere, (2) enter the alphanumeric code printed on the insert,
4  and (3) "enjoy your movie." (Marinelli Decl., Ex. B.)  The insert,
5  like the exterior of the Combo Pack packaging, also states, "Codes
6  are not for sale or transfer."  (Id.)

7    The RedeemDigitalMovies and Disney Movies Anywhere web pages
8  each set forth additional terms and conditions of use.  The former
9  states that Plaintiff Buena Vista Home Entertainment, Inc. retains
10  ownership of the codes and authorizes only their conditional use.[3]
11  The page also states that by redeeming a code, the user "represents
12  that [he] is the owner of the physical product that accompanied the
13  digital code at the time of purchase.  The redemption of a digital
14  code sold or transferred separate from the original physical
15  product is prohibited." (Declaration of Kelly Klaus, Ex. A.)  The
16  more substantial Movies Anywhere click-wrap terms of use provide
17  that only members with registered Movies Anywhere accounts, who
18  have by definition agreed to Movies Anywhere's terms of use, can
19  take advantage of the Movies Anywhere service.  (Klaus Decl., Ex. B
20  at 11.)  Among the terms of use are terms concerning digital copy
21  code redemption, which provide that a consumer "can enter
22  authorized . . . Digital Copy codes from a Digital Copy enabled . .
23  _____

24         [2](...continued)
25  should issue, this court will analyze the "best case scenario"-type
   language included on the *Beauty and the Beast* packaging.

26         [3] The pop-up "terms and conditions" dialog window refers to
27  "these terms and conditions" in several places, but does not appear
   to include all terms and conditions.  Instead, "all applicable
28  terms and conditions" are accessible via a separate link outside
   the dialog box.  (Declaration of Kelly Klaus, Ex. A.)

1   . physical product that is owned by [that consumer]."  (Id. at 15.)

2   The terms further state that the "sale, distribution, purchase, or

3   transfer of Digital Copy codes . . . is strictly prohibited."

4   (Id.)  The Movies Anywhere terms of use also state that Movies

5   Anywhere grants the registered member "a limited, personal use,

6   non-transferable, non-assignable, revocable non-exclusive and non-

7   sublicensable right" to stream or download movies and to use the

8   service.  (Id. at 12.)  The terms of service expressly restrict

9   users' right to copy the copyrighted works, except in accordance

10  with the Movies Anywhere terms of service.  (Id.)

11      Defendant Redbox Automated Retail, LLC ("Redbox") rents and

12  sells movies to consumers via tens of thousands of automated kiosks

13  that dispense DVD and Blu-ray discs.  (Declaration of Galen Smith

14  ¶¶ 4,6; Declaration of Richard Chamberlain ¶¶ 2,4.)  Redbox also

15  offers a "Redbox on Demand" service that allows consumers to stream

16  or download movies owned by studios other than Disney.  (Smith

17  Decl. ¶ 4.)  More recently, Redbox has begun to offer digital

18  downloads of Disney movies in the form of download codes.

19  (Chamberlain Decl. ¶ 7, Smith Decl. ¶ 17.)  Because Redbox does not

20  have a vendor agreement with Disney, Redbox acquires Disney films

21  by purchasing copies at retail outlets such as electronics stores,

22  grocery stores, and the like.  (Chamberlain Decl. ¶¶ 3, 5.)

23  Redbox purchases standalone Blu-rays and DVDs as well as Disney's

24  Combo Packs.  (Id. at ¶ 4.)  Redbox obtains digital download codes

25  for Disney movies by purchasing Combo Packs and removing the piece

26  of paper bearing the download code from Disney's packaging.  (Id.

27  at ¶ 7.)  Redbox then places the piece of paper bearing the code

28

1  into its own Redbox packaging and offers the code for sale at a
2  Redbox kiosk.  (Id.)

3      Disney's Complaint alleges that Redbox's resale of Combo Pack
4  digital download codes (1) constitutes contributory copyright
5  infringement, insofar as it encourages end users to make
6  unauthorized reproductions of Disney's copyrighted works, (2) is a
7  breach of the contract Redbox enters into with Buena Vista when
8  Redbox purchases Combo Packs, (3) interferes with Disney's
9  contracts with RedeemDigitalMovie.com users, and (4) violates
10  California false advertising and unfair competition laws.  Disney
11  now moves for a preliminary injunction enjoining Redbox from, among
12  other things, selling or transferring Disney digital download
13  codes.

14  **II.  Legal Standard**

15      A private party seeking a preliminary injunction must show
16  that: (i) it is likely to succeed on the merits; (ii) it will
17  suffer irreparable harm in the absence of preliminary relief; (iii)
18  the balancing of the equities between the parties that would result
19  from the issuance or denial of the injunction tips in its favor;
20  and (iv) an injunction will be in the public interest.  Winter v.
21  Natural Resources Def. Council, 555 U.S. 7, 20 (2008).  Preliminary
22  relief may be warranted where a party: (i) shows a combination of
23  probable success on the merits and the possibility of irreparable
24  harm; or (ii) raises serious questions on such matters and shows
25  that the balance of hardships tips in favor of an injunction.  See
26  Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th
27  Cir. 1987).  "These two formulations represent two points on a
28  sliding scale in which the required degree of irreparable harm

increases as the probability of success decreases." Id.  Under

both formulations, the party must demonstrate a "fair chance of

success on the merits" and a "significant threat of irreparable

injury" absent the issuance of the requested injunctive relief.[4]

Id.

## III. Discussion

A.   Breach of Contract

Disney contends that Redbox entered into a contract with

Disney when Redbox purchased and opened Disney Combo Packs that

included, on the outside of the packaging, the phrase "Codes are

not for sale or transfer."  (Motion at 9.)  The elements of a

breach of contract claim are (1) the existence of a contract, (2)

performance or excuse for nonperformance, (3) defendant's breach,

and (4) damages.  Oasis West Realty, LLC v. Goldman, 51 Cal. 4th

811, 821 (2011).  A valid contract requires capable, consenting

parties, a lawful object, and sufficient cause or consideration.

Cal. Civ. Code § 1550; Janda v. Madera Community Hosp., 16 F.

Supp. 2d 1181, 1186 (E.D. Cal. 1998).  In California, "[a] contract

for sale of goods may be made in any manner sufficient to show

agreement, including conduct by both parties which recognizes the

existence of such a contract."  Cal. Com. Code § 2204(1).  In

general, "silence or inaction does not constitute acceptance of an

offer."  Norcia v. Samsung Telecomm. Am., LLC, 845 F.3d 1279, 1284

(9th Cir. 2017) (quoting Golden Eagle Ins. Co. v. Foremost Ins.

---

[4]  Even under the "serious interests" sliding scale test, a plaintiff must satisfy the four Winter factors and demonstrate "that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

<u>Co.</u>, 20 Cal. App. 4th 1372, 1385 (1993).  Nevertheless, a party's

voluntary acceptance of the benefit of an offer may constitute

consent to a contract.  <u>Id.</u>  At the same time, however, even a

party that has accepted an offered benefit cannot be deemed to have

accepted a contract if the offeree did not have reasonable notice

that an offer had been made.  <u>Id.</u> (citing <u>Windsor Mills, Inc. v.</u>

<u>Collins & Aikman Corp.</u>, 25 Cal. App. 3d 987, 993 (1972)).

In <u>Norcia</u>, the defendant sought to enforce the terms of an

arbitration agreement set forth within a brochure that was located

inside a product box, and which therefore could not be accessed or

viewed by the consumer without opening the product packaging after

purchase.  <u>Norcia</u>, 845 F.3d at 1286.  The defendant contended that

the plaintiff had consented to the arbitration terms because,

notwithstanding the absence of any terms on the outside of the

packaging, the brochure was analogous to a "shrink-wrap license,"

which states on the outside of a product package that the user

agrees to further, as-yet undisclosed license terms by opening up

the packaging.[5]  <u>Id.</u>  Accepting the analogy for the sake of

---

[5] Plaintiff asserts that the instant case is distinguishable because "<u>Norcia</u> deals with 'shrink wrap' licenses, the terms of which are found inside the box or when software is booted up." (Reply at 8:19-20.)  The <u>Norcia</u> court defined a shrink-wrap license as "a form on the packing or on the outside of [a] CD-ROM containing [] software which states that by opening the packaging or CD-ROM wrapper, the user agrees to the terms of the license." <u>Norcia</u>, 845 F.3d at 1286 (quoting <u>Wall Data Inc. v. Los Angeles County Sheriff's Dep't</u>, 447 F.3d 769, 782 n.4 (9th Cir. 2006); <u>see also Arizona Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.</u>, 421 F.3d 981, 987 n.6 (9th Cir. 2005) (defining shrink-wrap license as one that "impose[s] restrictions that a consumer may discover only <i>after</i> opening and installing the software." (emphasis original); <u>Tompkins v. 23andMe,Inc.</u>, No. 5:13-CV-05682-LHK, 2014 WL 2903752 at *5 (N.D. Cal. June 25, 2014) ("A shrinkwrap agreement generally refers to a situation where a customer buys and receives a product, the written agreement is presented with the product

(continued...)

1  argument, the court nevertheless rejected the defendant's position.

2  Id.  Although acknowledging that a shrink wrap license might be

3  enforceable under California law, the court held that the

4  plaintiff's silence could not be deemed acceptance where there was

5  no indication on the outside of the packaging that opening the box

6  would constitute acceptance of further terms set forth inside the

7  box.  Id. at 1287 ("Even if a license to copy software could be

8  analogized to a brochure that contains contractual terms, the

9  outside of the Galaxy S4 box did not notify the consumer that

10  opening the box would be considered acceptance to the terms set

11  forth in the brochure." (emphasis added)); see also Marshall &

12  Swift/Boeckh, LLC v. URS Corp., No. CV-0804375-GAF, 2009 WL

13  10668449, at *17 (C.D. Cal. Aug. 26, 2009) (explaining that a

14  shrink-wrap license, even though it is a contract of adhesion, is

15  "fully enforceable unless certain other factors are present which,

16  under established legal rules – legislative or judicial – operate

17  to render it otherwise." (quoting DVD Copy Control Ass'n v.

18

19

20  ⁵(...continued)

21  after purchase, and the customer implicitly accepts by opening and
    keeping the product."). Here, Norcia is distinguishable only to

22  the extent that Disney contends that a single phrase on the
    exterior of its Combo Pack packaging itself constitutes a "box-top"

23  license agreement, to which Redbox consented when it opened the
    Combo Pack, as opposed to shrink wrap notice of further license

24  restrictions stated elsewhere, such as within the box or on the
    redemption service portals.  The court notes that although the box

25  tops also contain "Terms and Conditions Apply" fine print, Disney's
    breach of contract arguments do not rely upon that shrink wrap

26  license-type language and, as noted above, Disney disclaims the
    existence of any shrink wrap license.  In any event, the issue in

27  Norcia, as here, was whether external packaging put the offeree on
    notice that he was accepting a contract by opening the box.  See

28  Norcia, 845 F.3d at 1287).

8

Kaleidescape, Inc., 176 Cal. App. 4th 697, 716 (2009)) (internal
quotation marks omitted).

Disney argues that the circumstances here are more similar to
those before the court in Arizona Cartridge Remanufacturers
Association, Inc. v. Lexmark International, Inc., 421 F.3d 981 (9th
Cir. 2005).  There, the plaintiff brought false advertising and
unfair competition claims based upon an allegation that the
defendant was misleading customers into thinking that contractual
terms printed upon the outside of a printer cartridge box were
enforceable.  Lexmark, 421 F.3d at 983.  Because the case involved
license terms ostensibly printed in their entirety on the outside
of the product packaging, the court distinguished shrink wrap
license disputes and other cases involving lack of notice at the
time of purchase that additional terms applied.  Id. at 987 n.6.
With that understanding, the court analyzed the following "box-top
license" language:

> Please read before opening. Opening of this package or
> using the patented cartridge inside confirms your
> acceptance of the following license agreement. The patented
> cartridge is sold at a special price subject to a
> restriction that it may be used only once. Following this
> initial use, you agree to return the empty cartridge only
> to Lexmark for remanufacturing and recycling. If you don't
> accept these terms, return the unopened package to your
> point of purchase. A regular price cartridge without these
> terms is available.

Id. at 983-984.

The court rejected the plaintiff's argument, holding that the
box-top language was sufficient to constitute an enforceable
contract that consumers accepted by opening the box.  Id. at 987.
The court explained that the contract was enforceable because, by
its own terms, it gave notice of the existence of a license, set

forth the conditions of sale of that license, afforded the consumer the opportunity to read the terms of the contract before deciding whether to accept them, and provided consideration in the form of a reduced price, thus supporting the conclusion that a consumer who opened the box accepted the terms printed upon it.  Id. at 987-88.

The question before this Court, then, is whether language on the Combo Packs stating that "Codes are not for sale or transfer" is, like the box-top license in Lexmark, an enforceable license, and whether Redbox's decision to open the Combo Pack packaging notwithstanding that language constitutes acceptance of that license.  At this stage, whether considering the Combo Pack language as a shrink wrap or as a box-top license, Disney has not demonstrated a likelihood of success on the merits of that question.

The phrase "Codes are not for sale or transfer" cannot constitute a shrink wrap contract because, like the box at issue in Norcia, Disney's Combo Pack box makes no suggestion that opening the box constitutes acceptance of any further license restrictions. Norcia, 845 F.3d at 1287; see also SoftMan Prod. Co. v. Adobe Sys., Inc., 171 F. Supp. 2d 1075, 1087 (C.D. Cal. 2001) (finding a consumer's decision to open a software box bearing language stating, "NOTICE TO USERS: This product is offered subject to the license agreement included with the media" insufficient to constitute assent to a license).  Although Disney seeks to analogize its Combo Pack packaging and language to the packaging and terms in Lexmark, the comparison is inapt.  The thorough box-top license language in Lexmark not only provided consumers with specific notice of the existence of a license and explicitly stated

10

that opening the package would constitute acceptance, but also set forth the full terms of the agreement, including the nature of the consideration provided, and described a post-purchase mechanism for rejecting the license.  Here, in contrast, Disney relies solely upon the phrase "Codes are not for sale or transfer" to carry all of that weight.[6]  Unlike the box-top language in <u>Lexmark</u>, Disney's phrase does not identify the existence of a license offer in the first instance, let alone identify the nature of any consideration, specify any means of acceptance, or indicate that the consumer's decision to open the box will constitute assent.  In the absence of any such indications that an offer was being made, Redbox's silence cannot reasonably be interpreted as assent to a restrictive license.[7]

_____

[6] Disney also suggests that Redbox accepted license terms because it purchased and opened many Combo Packs.  This argument is not persuasive.  <u>See, e.g.</u>, <u>In re CFLC, Inc.</u>, 209 B.R. 508, 514 (B.A.P. 9th Cir. 1997) ("[T]he repetitive use of a standard form by one party, without a meeting of the minds or express agreement, is insufficient to establish a course of dealing.") (citing <u>Step-Saver Data Sys., Inc. v. Wyse Tech.</u>, 939 F.2d 91, 104 (3d Cir. 1991)). Disney's argument that Redbox understands that "Not for Sale or Transfer" indicates the existence of a license because Redbox also uses those terms is also unpersuasive.  (Mot. at 10:14-20.)  Disney ignores the fact that Redbox's statements do not appear in isolation, and are accompanied by language far closer to that in <u>Lexmark</u>.  (Klaus Decl., Exs. I, J.)  Furthermore, particularly in the absence of any evidence that particular terms have a particular meaning in the relevant industries, this Court cannot ascribe to any party knowledge of some special or coded definition of "Not for Sale or Transfer," or any other phrase.

[7] Suppose, for example, that a bulk package of pencils stated, "Individual pencils not for re-sale," but that a bulk package pencil purchaser nevertheless re-sold a single pencil.  It is doubtful that the manufacturer would be able to state a colorable claim for breach of contract or credibly argue that the consumer assented to a license.  Although the distinction between physical goods like pencils and arguably intangible products like a digital download code may be relevant in other contexts, no party has suggested that the nature of the product has any effect on notice

(continued...)

Indeed, the presence of other, similarly assertive but unquestionably non-binding language on the Combo Pack boxes casts further doubt upon the argument that the phrase "Not For Sale or Transfer" communicates the terms or existence of a valid offer. The packaging also states, for example, that "This product . . . cannot be resold or rented individually." (Marinelli Decl., Ex. A.) This prescription is demonstrably false, at least insofar as it pertains to the Blu-ray disc and DVD portions of the Combo Pack.[8] The Copyright Act explicitly provides that the owner of a particular copy "is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy." 17 U.S.C. § 109(a); UMG Recordings, Inc. v. Augusto, 628 F.3d 1175, 1180 (9th Cir. 2011) (discussing first sale doctrine). Thus, the clearly unenforceable "cannot be resold individually" language conveys nothing so much as Disney's preference about consumers' future behavior, rather than the existence of a binding agreement. At this stage, it appears that the accompanying "Not For Sale or Transfer" language plays a similar role.[9]

---

[7](...continued)
requirements or other traditional elements of contract formation.

[8] Any suggestion that "this product" refers to the Combo Pack as a whole, and not to the physical discs, is belied by the inclusion of the word "individually."

[9] Although Disney concedes that any attempt to curtail the secondary distribution of Blu-rays and DVDs would not be successful, Disney maintains that any transfer of a Combo Pack in its entirety would necessarily violate the supposed contract because the download code portion of the Combo Pack is non-transferable. Thus, under Disney's interpretation of the contract, a consumer who purchases a Combo Pack for his child or relative and
(continued...)

1    Accordingly, Disney has failed to meet its burden to

2    demonstrate a likelihood of success on the merits of its breach of

3    contract claim.

4    B.   Contributory Copyright Infringement

5    Disney's First Cause of Action alleges that Redbox

6    contributorily infringes upon Disney's copyrights by enabling and

7    encouraging individual consumers to violate the RedeemDigitalMovies

8    and Disney Movies Anywhere use licenses, and in the process create

9    unauthorized reproductions of Disney's copyrighted works.

10   A copyright owner has the exclusive right to reproduce the

11   copyrighted work.  17 U.S.C. § 106.  "To establish copyright

12   infringement, a plaintiff must prove two elements: '(1) ownership

13   of a valid copyright, and (2) copying of constituent elements of

14   the work that are original.'"  <u>L.A. Printex Indus., Inc.v.</u>

15   <u>Aeropostale, Inc.</u>, 676 F.3d 841, 846 (9th Cir. 2012) (citing <u>Feist</u>

16   <u>Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361, (1991)).

17   A defendant is contributorily liable for copyright infringement if

18   he has "intentionally induced or encouraged direct infringement."

19   <u>MDY Indus., LLC v. Blizzard Entm't, Inc.</u>, 629 F.3d 928, 937 (9th

20   Cir. 2010) (internal alterations and quotation marks omitted).  A

21   copyright licensee infringes upon a copyright if he exceeds the

22   scope of his license.  <u>S.O.S., Inc. v. Payday, Inc.</u>, 886 F.2d 1081,

23   1085 (9th Cir. 1989) ("To prevail on its claim of copyright

24   infringement, [the copyright owner] must prove . . . 'copying' of

25   

26   _____

     [9](...continued)
27   proceeds to give that Combo Pack to a family member as a gift has
     violated the purchase agreement and is subject to suit for breach
28   of contract, notwithstanding Disney's representation that it is
     unlikely to ever bring such a claim.

protectable expression by [the accused infringer] beyond the scope of [the] license.")

A restrictive license exists where the copyright owner "(1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." Vernor v. Autodesk, Inc., 621 F.3d 1102, 1111 (9th Cir. 2010). There is little doubt that the RedeemDigitalMovies and Movies Anywhere terms of service meet all of these criteria. The terms of the RedeemDigitalMovies license state that Plaintiff Buena Vista owns all digital movie codes and that users may only use digital codes as authorized. The terms further require that a user "represent[] that [he] is the owner of the physical product that accompanied the digital code at the time of purchase," and expressly forbid the "redemption of a digital code sold or transferred separate from the original physical product." The Movies Anywhere terms similarly specify that they comprise "a license agreement and not an agreement for sale . . ." that creates any ownership interest in licensed content, provide that users can only "enter authorized . . . Digital Copy codes from a Digital Copy enabled . . . physical product that is owned by [that user]," and state that "the purchase of Digital Copy codes . . . is strictly prohibited." By buying a standalone Disney code from Redbox and then redeeming that code on the licensed download service portals, end users necessarily violate the terms of the licenses and, Disney contends, therefore infringe upon Disney's copyrights. See MDY Indus., LLC, 629 F.3d at 939 (explaining that

14

1   violations of license conditions constitute copyright

2   infringement).[10]

3        Nevertheless, Redbox argues that Disney cannot demonstrate a

4   likelihood of success on the merits of its contributory copyright

5   claim because Disney has engaged in copyright misuse.  Copyright

6   misuse is an affirmative defense that "prevents copyright holders

7   from leveraging their limited monopoly to allow them control of

8   areas outside the monopoly."  <u>A&M Records, Inc. v. Napster, Inc.</u>,

9   239 F.3d 1004, 1026 (9th Cir. 2001).  Disney responds that it is

10  not guilty of copyright misuse because it is not "trying to extend

11  its copyright over the underlying movies to other, non-copyrighted

12  products."[11]  (Reply at 6:24-25.)  Disney is correct that the

13  copyright misuse defense often applies to situations in which

14  copyright holders attempt to use their copyright to obtain some

15  power over other, non-copyrighted goods or services.  In <u>Practice</u>

16  <u>Management Information Corporation v. American Medical Association</u>,

17  121 F.3d 516 (9th Cir. 1997), for example, the defendant misused

18  its copyright when it obtained an unfair advantage over its

19  competitors by licensing a copyrighted coding system on the

20  _____

21      [10] The court notes that Defendant's opposition to Plaintiffs'
    argument regarding contributory infringement appears to

22  misunderstand the nature of Plaintiffs' claim.  Defendant argues
    that "there is no license and even Plaintiffs do not claim one was

23  created."  (Opposition at 13:12-13.)  Although that statement is
    arguably true with respect to the relationship between Disney and

24  Redbox, Disney's contributory copyright infringement claim is
    predicated not upon that relationship, but rather upon the license

25  agreement between the end user/downloader and one or both of the
    digital download services.

26      [11] Redbox also argues that Disney is engaged in copyright
    misuse because it is attempting to "impose an artificial price

27  floor by eliminating competition."  (Opposition at 17:12-13.)
    Although copyright misuse may be rooted in anticompetitive behavior

28  or public policy considerations, Redbox does not adequately develop
    its price-fixing theory.

condition that licensees agree not to use the competing systems. Practice Mgmt., 121 F.3d at 521. In Omega S.A. v. Costco Wholesale Corporation, 776 F.3d 692 (9th Cir. 2015), the owner of a copyrighted design sought to use its copyright to restrict sales of otherwise uncopyrightable watches. Omega, S.A., 776 F.3d at 693-94. The watch seller frustrated the plaintiff's domestic distribution strategy by obtaining genuine watches abroad, then legitimately re-selling them in the United States. Id. In an attempt to foreclose this practice, the copyright holder began engraving a "barely perceptible" version of the copyrighted design onto the bottom of the watches, then sued the watch seller for copyright infringement.[12] Id. The district court concluded that the copyright holder misused its copyright "by leveraging its limited monopoly in being able to control the importation of [the copyrighted design] to control the importation of [the] watches." Id.

Here, Disney contends that its actions are distinguishable from those at issue in Practice Management and Omega, S.A. because Disney's control of and restraints on digital downloads only pertain to the copyrighted work itself, and not to other, non-copyrighted products such as the competitors' code systems in Practice Management or the watches in Omega, S.A. The copyright misuse defense, however, is not so narrow as Disney would have it. Indeed, copyright misuse need not even be grounded in anti-competitive behavior, and extends to any situation implicating "the public policy embodied in the grant of a copyright." Omega, S.A.,

---

[12] See 17 U.S.C. § 602.

776 F.3d at 699-700 (Wardlaw, J. concurring).  The pertinent inquiry, then, is not whether the digital download services' restrictive license terms give Disney power over some entirely unrelated product, but whether those terms improperly grant Disney power beyond the scope of its copyright.  A&M Records, Inc., 239 F.3d at 102.

The Copyright Act gives copyright owners the exclusive right to distribute copies of the copyrighted work.  17 U.S.C. § 106(3); Adobe Sys., Inc. v. Christenson, 809 F.3d 1071, 1076 (9th Cir. 2015).  That right is exhausted, however, once the owner places a copy of a copyrighted item into the stream of commerce by selling it.  Id.; 17 U.S.C. § 109(a); Vernor v. Autodesk, 621 F.3d 1102, 1107 (9th Cir. 2010).  In other words, once a copyright owner transfers title to a particular copy of a work, the transferor is powerless to stop the transferee from redistributing that copy as he chooses.  UMG Recordings, 628 F.3d at 1180.

There can be no dispute, therefore, that Disney's copyrights do not give it the power to prevent consumers from selling or otherwise transferring the Blu-ray discs and DVDs contained within Combo Packs.  Disney does not contend otherwise.[13]  Nevertheless, the terms of both digital download services' license agreements purport to give Disney a power specifically denied to copyright holders by § 109(a).  RedeemDigitalMovies requires redeemers to represent that they are currently "the owner of the physical product that accompanied the digital code at the time of purchase," while the Movies Anywhere terms of use only allow registered

---

[13] See note 9, supra.

1    members to "enter authorized . . . Digital Copy codes from a

2    Digital Copy enabled . . . physical product that is owned by [that

3    member]."[14]   Thus, Combo Pack purchasers cannot access digital

4    movie content, for which they have already paid, without exceeding

5    the scope of the license agreement unless they forego their

6    statutorily-guaranteed right to distribute their physical copies of

7    that same movie as they see fit.[15]  This improper leveraging of

8    Disney's copyright in the digital content to restrict secondary

9    transfers of physical copies directly implicates and conflicts with

10   public policy enshrined in the Copyright Act, and constitutes

11   copyright misuse.[16]

12       Accordingly, Disney has not demonstrated a likelihood of

13   success on the merits of its contributory copyright infringement

14   claim.[17]

15   _____

16       [14] Redbox also argues that "physical product" includes the
     pieces of paper upon which the digital download code is printed,
17   and that digital downloaders therefore do not violate any terms of
     use even when inputting a code purchased from Redbox.  That
18   argument has no merit.  The paper insert, like the alphanumeric
     code it bears, has no value separate from the digital content that
     the code represents.
19       [15] At argument, Disney suggested that consumers can contract
20   away their redistribution rights.  To the extent Disney suggests
     that that occurred here, that argument has no merit, for the
21   reasons described in the breach of contract discussion, above.
         [16] Although the court need not and does not address the
22   remaining Winter factors beyond likelihood of success on the
     merits, the court notes that the policy considerations underlying
23   the copyright misuse defense raise serious questions about Disney's
     ability to demonstrate that an injunction essentially ratifying
     Disney's misuse would nevertheless be in the public interest.
24       [17]  As alluded to in the context of the box-top and shrink
25   wrap license discussion, above, significant questions remain
     regarding the representations made to consumers on the Combo Pack
26   packaging.  Disney characterizes the purchase of "Digital HD" as
     effectively the purchase of a coupon that will allow consumers to
27   download digital content only if they agree to the terms of a
     license in the future.  Although beyond the scope of briefing here,
28   the question whether the representations made on the box actually
                                              (continued...)

C.   First Sale Doctrine

Much of the parties' briefing and argument focuses on Redbox's contention that Disney's attempts to prohibit transfer of digital download codes are barred by the first sale doctrine.  For the reasons stated above, the issues presently before the court can be resolved irrespective of the first sale doctrine question.  Indeed, at this stage of proceedings, it appears to the court that the first sale doctrine is not applicable to this case.

The first sale doctrine, recognized first by the Supreme Court and later codified, allows the "owner of a particular copy or phonorecord lawfully made under [the Copyright Act] . . . to sell or otherwise dispose of the possession of that copy or phonorecord," without the permission of the copyright holder.  UMG v. Augusto, 628 F.3d 1175, 1180 (9th Cir. 2011) (quoting 17 U.S.C. § 109(a)); Bobbs-Merrill Co. v. Strauss, 210 U.S. 339, 341 (1908).  Thus, as explained above, a copyright owner's exclusive right to distribute a particular copy of a copyrighted work is exhausted once the owner transfers title to that copy.  Christenson, 809 F.3d 1071 at 1076 (9th Cir. 2015); Vernor, 621 F.3d at 1107; 17 U.S.C. § 106(3).

Not all transfers of a copy of a copyrighted work constitute a transfer of title sufficient to trigger exhaustion of the copyright holder's distribution rights.  Vernor, 621 F.3d at 1111.  Under certain conditions, a transferee may be a licensee rather than an

---

[17](...continued)
support Disney's characterization or give rise to other legal or equitable defenses to allegations of infringement and other potential claims casts further doubt upon Disney's likelihood of success.

owner, and will not enjoy the protections of the first sale

doctrine.  Id.  Redbox spends much of its opposition arguing that

Disney's transfer of a digital code in a Combo Pack does not bear

the indicia of a license, and therefore should be considered a

transfer of title to a particular copy.  This argument misses the

thrust of Disney's position regarding the first sale doctrine.

Disney does not argue that it transferred a restrictive license

rather than title to a digital copy, but rather that the first sale

doctrine does not apply here for the fundamental reason that the

digital download codes are not "copies" in the first instance, let

alone "particular copies."  For copyright purposes, "'[c]opies' are

material objects, other than phonorecords, in which a work is fixed

by any method now known or later developed, and from which the work

can be perceived, reproduced, or otherwise communicated, either

directly or with the aid of a machine or device."  17 U.S.C. § 101.

By Disney's reading, no "copy" exists until a copyrighted work is

fixed onto a downloader's hard drive, and Redbox's purchase of a

download code therefore cannot possibly involve a "particular copy"

to which a first sale defense could apply.  Thus, Disney contends,

this case is solely about the exclusive right to reproduce a

copyrighted work, and has nothing to do with the right of

distribution or, by extension, the first sale doctrine's limitation

on that exclusive right.

    One court that addressed a similar issue applied logic similar

to that Disney puts forth here.  In Capitol Records, LLC v. ReDigi

Inc., 934 F. Supp. 2d 640 (S.D.N.Y. 2013), the defendant attempted

to create a marketplace for used digital music downloads by

devising a technology that "migrated" a seller's digital music file

from the seller's computer, data packet by data packet, onto the
defendant's server, from whence it could then again be migrated to
a secondary purchaser's computer without any bit of data ever
existing in any two places at the same time.  ReDigi Inc., 934 F.
Supp. 2d at 645.  On summary judgment, the court rejected the
defendant's first sale doctrine defense.[18]  Id. at 655.  Regardless
of the defendant's claim that no datum existed in two places at the
same time, the court observed, the digital files at issue could not
be re-sold without a "new" version first being created on the
defendant's physical server.  Id.  Thus, the court concluded, the
new version was not the same "particular copy," but rather an
unauthorized reproduction of a copyrighted work.[19]  Id.  "Put
another way, the first sale defense is limited to material items,
like records, that the copyright owner put into the stream of
commerce."  Id.

Policy considerations also supported the ReDigi court's
conclusion.  In 2001, the United States Copyright Office, at

---

[18] With respect to the right of reproduction, the ReDigi court
rejected the first sale defense out of hand as inapplicable.
ReDigi, 934 F.Supp.2d at 655.

[19] The ReDigi court's discussion of the first sale defense
concerned the plaintiff's exclusive distribution right, which
applies only to "copies or phonorecords."  17 U.S.C. § 106; ReDigi,
934 F.Supp.2d at 655.  "Phonorecords," like "copies," are defined
as "material objects."  17 U.S.C. § 101.  Nevertheless, no party
disputed that an electronic transfer of a copyrighted work
constitutes a distribution for copyright purposes.  ReDigi, 934
F.Supp.2d at 651.  One court, in determining that electronic files
qualify as phonorecords, has stated that "Electronic Files Are
Material Objects."  London-Sire Records, Inc. v. Doe 1, 542 F.
Supp. 2d 153, 170 (D. Mass. 2008).  As the London-Sire court
elaborated, however, "more accurately, *the appropriate segment of
the hard disk*[] is . . . a 'phonorecord' within the meaning of the
statute."  Id. at 171 (emphasis added).

Congress' command, prepared a report on, among other things, the

effect of emerging technologies on copyright law.  USCO, Library of

Cong., DMCA Section 104 Report (2001) ("USCO Report"); Digital

Millennium Copyright Act of 1998, § 104, Pub. L. No. 105-304, 112

Stat. 2860, 2876.  The Copyright Office engaged in a lengthy

discussion of the first sale doctrine, including the rationales

underpinning the doctrine as it relates to tangible goods in the

physical world.  USCO Report at 74-101. The Copyright Office

specifically addressed the potential implications of expressly

expanding the first sale doctrine "to permit the transmission of a

digital work by the owner of a lawful copy of that work, so long as

that copy is destroyed."  USCO Report at 80-81.  Ultimately, the

USCO recommended that the first sale doctrine not be explicitly

expanded to include digital transmission.  As the USCO report

explained:

> Physical copies of works degrade with time and use, making
> used copies less desirable than new ones. Digital
> information does not degrade, and can be reproduced
> perfectly on a recipient's computer. The "used" copy is
> just as desirable as (in fact, is indistinguishable from)
> a new copy of the same work. Time, space, effort and cost
> no longer act as barriers to the movement of copies, since
> digital copies can be transmitted nearly instantaneously
> anywhere in the world with minimal effort and negligible
> cost. The need to transport physical copies of works, which
> acts as a natural brake on the effect of resales on the
> copyright owner's market, no longer exists in the realm of
> digital transmissions. The ability of such "used" copies to
> compete for market share with new copies is thus far
> greater in the digital world.  Even the "lending" of a
> fairly small number of copies of a work by digital
> transmission could substitute for a large number of
> purchases. For example, one could devise an aggregation
> site on the Internet that stores (or, in a peer-to-peer
> model, points to) multiple copies of an electronic book. A
> user can "borrow" a copy of the book for as long as he is
> actually reading it.  Once the book is "closed," it is
> "returned" into circulation. Unlike a typical lending
> library, where the book, once lent to a patron, is out of
> circulation for days or weeks at a time, the electronic

book in this scenario is available to other readers at any
moment that it is not actually being read. Since, at any
given time, only a limited number of readers will actually
be reading the book, a small number of copies can supply
the demand of a much larger audience. The effect of this
activity on the copyright owner's market for the work is
far greater than the effect of the analogous activity in
the non-digital world.

***

[T]hese differences between circulation of tangible and
intangible copies is directly relevant to the balance
between copyright owners and users in section 109. In
weighing the detrimental effect of a digital first sale
doctrine on copyright owners' markets against the
furtherance of the policies behind the first sale doctrine
it must be acknowledged that the detrimental effect
increases significantly in the online environment.

***

In the final analysis, the concerns about expanding first
sale to limit the reproduction right, harm to the market as
a result of the ease of distribution, and the lessened
deterrent effect of the law that could promote piracy,
outweigh the pro-competitive gains that might be realized
from the creation of a digital first sale doctrine.

USCO Report at 82-83, 85, 100.

Notwithstanding ReDigi, the plain language of the statutes,
and the important policy considerations described by the Copyright
Office, Redbox urges this court to conclude that Disney's sale of
a download code is indistinguishable from the sale of a tangible,
physical, particular copy of a copyrighted work that has simply
not yet been delivered.  Even assuming that the transfer is a sale
and not a license, and putting aside what Disney's representations
on the box may suggest about whether or not a "copy" is being
transferred, this court cannot agree that a "particular material
object" can be said to exist, let alone be transferred, prior to
the time that a download code is redeemed and the copyrighted work
is fixed onto the downloader's physical hard drive.  Instead,
Disney appears to have sold something akin to an option to create

1    a physical copy at some point in the future.[20]  Because no

2    particular, fixed copy of a copyrighted work yet existed at the

3    time Redbox purchased, or sold, a digital download code, the first

4    sale doctrine is inapplicable to this case.

5         D.   Additional Claims

6         Disney also alleges that Redbox's sale of digital download

7    codes constitutes "tortious interference" with the contractual

8    relationship formed between Disney's and downloaders when the

9    latter agree to the digital download services' terms of use.  A

10   plaintiff alleging intentional interference with an existing

11   contractual relationship must show "(1) a valid contract between

12   plaintiff and a third party; (2) defendant's knowledge of this

13   contract; (3) defendant's intentional acts designed to induce a

14   breach or disruption of the contractual relationship; (4) actual

15   breach or disruption of the contractual relationship; and (5)

16   resulting damage."  Quelimane Co. v. Stewart Title Guaranty Co.,

17   19 Cal. 4th 26, 55 (1998) (quoting Pac. Gas & Elec. Co. v. Bear

18   Stearns & Co.), 50 Cal. 3d 1118, 1126 (1990).

19        The parties' discussion of Disney's intentional interference

20   claims are relatively undeveloped, and largely derivative of other

21   arguments.  Furthermore, even assuming that Disney is a

22   beneficiary of the contracts between the online redemption

23   services and their users, Plaintiffs have submitted no evidence of

24   pre-existing contracts between the redemption services and any

25

26        [20] Again, whether that fact is adequately communicated to
27   purchasers, whether purchasers are ultimately able to enjoy that
     benefit, and whether the answers to those questions give rise to
28   potential defenses or affirmative claims are all separate issues.
     See note 14, supra.

1  user who subsequently purchased a download code from Redbox.  For

2  these reasons, and for the reasons stated above, Disney has not

3  met its burden to show a likelihood of the success on the merits

4  of its intentional interference claim, and particularly the first,

5  second, and third elements of that claim.

6      Nor, at this stage, has Disney demonstrated a likelihood of

7  success on the merits of its state law false advertising and

8  unfair competition claims.[21]  Although Disney alleges that Redbox

9  misleads customers by omitting details about license restrictions

10  Disney imposes upon digital downloaders, as noted above,

11  significant questions remain about the validity and enforceability

12  of those restrictions.  <u>See</u> note 14, <u>supra</u>.  Nor has Disney

13  sufficiently demonstrated, at this stage, that it has standing to

14  assert false advertising claims in the absence of its own reliance

15  upon Redbox's statements.  <u>See</u> <u>Youngevity Int'l Corp. v. Smith</u>,

16  224 F.Supp.3d 1022, 1031 (S.D. Cal. 2016); <u>L.A. Taxi Cooperative,</u>

17  <u>Inc. v. Uber Technologies, Inc.</u>, 114 F.Supp.3d 852, 866 (S.D. Cal.

18  2015).

19  **IV.  Conclusion**

20      For the reasons stated above, Disney has failed to

21  demonstrate a likelihood of success on the merits of its claims.

22  The court need not, therefore, address the remaining preliminary

23  //

24  //

25

26

27      [21] Plaintiffs' unfair competition claim under California

28  Business & Professions Code § 17200 is predicated upon Plaintiffs'
   other claims.

injunction factors.  Plaintiffs' Motion for Preliminary Injunction is DENIED.


IT IS SO ORDERED.


Dated: February 20, 2018

DEAN D. PREGERSON
United States District Judge